**[Print in black ink all areas in bold letters. This summons must be served with a complaint.]**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------x

__CLAYTON  HOWARD_____,

**SUMMONS**

**[your name(s)]**                      Plaintiff(s),
                              - against-

**Index Number**

10149 / 2025

NETFLIX INC, GUNIT FILMS AND TELEVISION, HOUSE OF

NON FICTION INC., WEST TOWER ROAD, LLC, CURTIS

**Date    Index    Number
Purchased**

~~JACKSON (a.k.a. 50 cent), ALEXANDRA STAPLETON~~_____,
__,**[name(s) of party being sued]**          Defendant(s).
-----------------------------------------------------------------x

20___

To the Person(s) Named as Defendant(s) above:

PLEASE TAKE NOTICE THAT YOU ARE SUMMONED to answer the complaint of the plaintiff(s) herein and to serve a copy of your answer on the plaintiff(s) at the address indicated below within 20 days after service of this Summons (not counting the day of service itself), or within 30 days after service is complete if the Summons is not delivered personally to you within the State of New York.

YOU ARE HEREBY NOTIFIED THAT should you fail to answer, a judgment will be entered against you by default for the relief demanded in the complaint.

Dated: _December  24_____, 20_25_
      **[date of summons]**

_Clayton Howard_
**[sign your name]**

Clayton howard

**[print your name]**

Clayton Howard
24 Orchard Street
Carteret, New Jersey 07008
(929)781-7791
itsclaytonhoward@gmail.com

**FILED**

**DEC 26 2025**

NEW YORK COUNTY
COUNTY CLERK

**[your address(es), telephone number(s)]**

Defendant ( s )NETFLIX INCCorporation Trust Center, 1209 Orange Street,Wilmington, DE 19801

GUNIT FILMS AND TELEVISION INC10 Bank Street, Suite 560 White Plains, NY 10606 _ _ _ _

HOUSE OF NON FICTION 2000 Avenue of the Stars Los Angeles, CA 90067 _ _ _ _ _ _ _ _

~~CURTIS JACKSON/ ALEXANDRA STAPLETON~~ C/O/
DAVIS WRIGHT TREMAINE LLP_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
~~5870 West Jefferson Blvd~~
Los Angeles, CA 90016            **[address(es) of party being sued]**

CommenceAction - 12/2018

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK

CLAYTON HOWARD,

     *Plaintiff,*

-against-

NETFLIX, INC.,
CURTIS JACKSON (professionally known as "50 Cent"),
ALEXANDRIA STAPLETON,
G-UNIT FILMS AND TELEVISION INC.,
HOUSE OF NONFICTION INC., and
WEST TOWER ROAD LLC,

     *Defendants,*

Index No.: 101491/2025

VERIFIED COMPLAINT

JURY TRIAL DEMANDED

**FILED**

**DEC 26 2025**

NEW YORK COUNTY
COUNTY CLERK

Plaintiff CLAYTON HOWARD, acting Pro Se, for his Complaint against Defendants
NETFLIX, INC., CURTIS JACKSON (professionally known as "50 Cent"),
ALEXANDRIA STAPLETON, G-UNIT FILMS AND TELEVISION INC., HOUSE OF
NONFICTION INC., and WEST TOWER ROAD LLC (collectively "Defendants"),
alleges upon personal knowledge as to himself and upon information and belief as to all
other matters, as follows:

### NATURE OF THE ACTION

1. This is an action for fraudulent inducement, defamation per se, intentional infliction of
emotional distress, and breach of the implied covenant of good faith and fair dealing
arising from Defendants' calculated exploitation and misrepresentation of Plaintiff's
story as a documented federal sex trafficking victim in the Netflix documentary series
"Diddy: The Making of a Bad Boy" (hereinafter "The Reckoning").

2. Plaintiff is a named victim in Count 3 of the federal criminal conviction of Sean Combs
and has pending civil actions against both Mr. Combs and Ms. Ventura in the United

States District Court for the Central District of California, Case No. CV25-06031(AH), filed June 29, 2025.

3. Defendants, through a series of fraudulent misrepresentations and promises that Plaintiff's complete and truthful account would be told, induced Plaintiff to provide his story, materials, and multiple interviews for their documentary production.

4. In direct contravention of their express promises, Defendants deliberately edited, distorted, and misrepresented Plaintiff's account to portray Cassie Ventura—Plaintiff's primary trafficker—as a victim, while omitting and suppressing Plaintiff's testimony that he was sex trafficked by Ventura, thereby inflicting severe harm upon Plaintiff's reputation, credibility as a federal witness, and mental health.

5. This calculated misrepresentation was done in furtherance of Defendant Curtis Jackson's personal and business vendetta against Sean Combs and to create a commercially profitable narrative that silenced a documented trafficking victim to protect a documented trafficker.

PARTIES

6. Plaintiff CLAYTON HOWARD is an individual who resides in the State of New Jersey and is a documented victim of sex trafficking under federal law who has cooperated fully with federal prosecutors in the criminal investigation and prosecution of Sean "Diddy" Combs.

7. Defendant NETFLIX, INC. ("Netflix") is a Delaware corporation with its principal place of business in California that distributes audiovisual content, including "The Reckoning," throughout the United States and internationally, including in New York County, New York. Netflix released, distributed, and profited from "The Reckoning" which aired on or about December 2, 2024.

8. Defendant CURTIS JACKSON, professionally known as "50 Cent," is an individual who, upon information and belief, resides in the State of New York and served as an executive producer of "The Reckoning" through his company G-Unit Films and Television Inc. Jackson has a well-documented personal and business vendetta against Sean Combs.

9. Defendant ALEXANDRIA STAPLETON ("Stapleton") is an individual who, upon information and belief, resides in the State of New York and served as Director and/or

Executive Producer of "The Reckoning" and was directly involved in interviewing Plaintiff and making editorial decisions regarding the documentary.

10. Defendant G-UNIT FILMS AND TELEVISION INC. ("G-Unit Films") is, upon information and belief, a New York corporation with its principal place of business in New York that served as a production company for "The Reckoning."

11. Defendant HOUSE OF NONFICTION INC. ("House of Nonfiction") is, upon information and belief, a New York corporation with its principal place of business in New York that served as a production company for "The Reckoning," and for which Stapleton and Vanessa Sanchez are employees or agents.

12. Defendant WEST TOWER ROAD LLC ("West Tower Road") is, upon information and belief, a New York limited liability company that entered into the Materials License Agreement dated July 19, 2024 with Plaintiff and served as a production entity for "The Reckoning."

### JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action pursuant to N.Y. Const. art. VI, § 7 and CPLR § 301, as the causes of action sound in tort and contract and arise under New York State law.

14. This Court has personal jurisdiction over all Defendants because they have sufficient minimum contacts with New York, purposefully availed themselves of the benefits and protections of New York law, transacted business within New York, produced the documentary in New York, and the Materials License Agreement specifies that New York law governs all disputes.

15. Venue is proper in New York County pursuant to CPLR § 503 because Defendants maintain places of business in New York County, substantial acts giving rise to the claims occurred in New York County (including interviews conducted in Brooklyn and Midtown Manhattan), and the Materials License Agreement executed by West Tower Road specifies that New York law governs.

### FACTUAL ALLEGATIONS

Plaintiff's Status as a Federal Sex Trafficking Victim

16. Between approximately 2009 and 2019, Plaintiff Clayton Howard was a victim of sex trafficking as defined under 18 U.S.C. § 1591, perpetrated by both Sean "Diddy" Combs and Casandra "Cassie" Ventura.

17. Plaintiff was recruited, harbored, transported, and provided for the purposes of commercial sex acts that were induced through a combination of force, fraud, and coercion in violation of federal law.

18. Specifically, Plaintiff was paid to fly from New York City to Los Angeles and from New York City to Miami over a period of years for the sole purpose of engaging in sexual activities with Cassie Ventura.

19. Cassie Ventura was Plaintiff's primary contact and offender throughout this eight-year period, not Sean Combs. Plaintiff never had any sexual encounters with Sean Combs.

20. Plaintiff has cooperated fully with federal prosecutors in the criminal investigation and prosecution of Sean Combs, providing testimony and evidence regarding his trafficking victimization.

21. Plaintiff is a named victim in Count 3 of the federal criminal conviction of Sean Combs.

22. Plaintiff has filed civil actions against both Sean Combs and Casandra Ventura in the United States District Court for the Central District of California, Case No. CV25-06031(AH), filed June 29, 2025, arising from the sex trafficking scheme.

    a. As a federally recognized trafficking victim under 18 U.S.C. § 1591, Plaintiff is entitled to specific protections under federal and state law, including the Crime Victims' Rights Act (18 U.S.C. § 3771), which guarantees victims the right to be treated with fairness and respect for their dignity and privacy."

    b. The U.S. Department of Justice has recognized that re-traumatization of trafficking victims through exploitation of their stories constitutes a form of continued victimization. See DOJ Office for Victims of Crime, Human Trafficking Task Force e Guide (2023)."

    c. As a documented victim of sex trafficking, Plaintiff is entitled to enhanced legal protections under federaland state law that prohibit further exploitation, including:

        i. U.S.C. § 3771 (Crime Victims' Rights Act): Right to be treated with fairness and respect for dignity

   ii. 18 U.S.C. § 1595 (TVPA civil remedy): Right to protection from continued victimization

   iii. 34 U.S.C. § 20101 et seq. (Victims' Rights and Restitution Act): Right to prevention of re-traumatization

d. New York and federal law recognize a fundamental public policy against the commercial exploitation of trafficking victims' trauma. *See Doe v. Backpage.com, LLC,* 104 F. Supp. 3d 149, 157 (D. Mass. 2015) (recognizing that exploitation of trafficking victims violates public policy); *People v. Evans,* 85 N.Y.2d 313, 318 (1995) (public policy strongly protects vulnerable victims from continued exploitation).

e. Research recognized by federal courts establishes that trafficking victims suffer from complex trauma that affects decision-making capacity, creates vulnerabilities to manipulation, and produces lasting psychological effects. *See United States v. Todd,* 627 F.3d 329,334 (9th Cir. 2010); *United States v. Jungers,* 702 F.3d 1066, 1072-73 (8th Cir. 2013).

f. Plaintiffs status as a sex trafficking victim has been formally recognized by:

   i. The United States District Court for the Southern District of New York in *United States v. Sean Combs,* Case No. 24-cr-542(AS), where Plaintiff is identified as Victim #2 in Count 3

   ii. Federal prosecutors who have accepted Plaintiffs cooperation and testimony

   iii. The Court's victim services division, which has provided Plaintiff with victim advocate support

g. Plaintiffs' role as a cooperating witness in the federal criminal prosecution of Sean Combs places him in a uniquely vulnerable position. Any distortion or misrepresentation of his testimony undermines not only his personal credibility but also the integrity of federal prosecutorial efforts to hold sex traffickers accountable.

h. Plaintiffs February 27, 2025 email to Defendants specifically referenced that Rolling Stone magazine had previously distorted his account, attributing statements to the wrong perpetrator and omitting critical information about

Cassie Ventura's role. This demonstrates a pattern of media entities exploiting
Plaintiffs story while protecting his primary trafficker-a pattern Defendants
continued and amplified.

23. Plaintiff's account is unique and material because he was physically present in the room
with both Combs and Ventura during the relevant time period and has firsthand
knowledge of the dynamics of their relationship and the trafficking scheme.

Initial Contact and Representations by Defendants

24. On or about May 14, 2022, Plaintiff was contacted by Attorney Tyrone Blackburn, who
was representing Plaintiff in civil matters against both Sean "Diddy" Combs and
Casandra "Cassie" Ventura, regarding participation in a documentary Netflix was
creating about Sean Combs.

25. Plaintiff spoke with Alexandria Stapleton, who identified herself as either the "Director"
or "Executive Producer" of the documentary project.

26. Stapleton and other agents of Defendants made material representations to Plaintiff
during these initial communications, including but not limited to:

    a. That they wanted to tell Plaintiff's complete and true story;

    b. That Plaintiff's account as a victim would be presented accurately and fairly;

    c. That the documentary would provide "something different than all the rest of the
content coming out";

    d. That Plaintiff's perspective was important and unique because he was present
with both Combs and Ventura for approximately eight years;

    e. That Plaintiff's story as a trafficking victim would be told truthfully.

27. It was agreed that Plaintiff would participate in the documentary and that his story
would be told truly, which was one of Plaintiff's primary requirements when agreeing to
participate.

28. Plaintiff understood that the content would be owned by Defendants and was willing to
accept this arrangement as long as his story was truly and accurately told.

29. These representations were made with the intent to induce Plaintiff to provide his story,
cooperate with interviews, and execute the Materials License Agreement.

The First Interview and Plaintiff's Immediate Concerns

30. Several months after the initial contact, Plaintiff was brought to a location in Midtown Manhattan, somewhere along the west side parkway, for his first interview.

31. During the first interview conducted by Stapleton, Plaintiff was asked more about Mr. Combs than Ms. Ventura.

32. Plaintiff had no experience conducting documentary interviews and answered questions as best he could, believing the conversation went well based on representations made by Stapleton.

33. However, immediately upon conclusion of the first interview, Plaintiff felt that he had only told one side of the story based on the interviewing techniques employed by Stapleton.

34. Plaintiff was not asked sufficient questions about Casandra Ventura, which bothered him because Casandra Ventura is his primary offender and sex trafficker.

35. Within a few days of the first interview, Plaintiff contacted Vanessa Sanchez, an employee or agent of Defendants House of Nonfiction, Stapleton, and the production companies.

36. Plaintiff expressed to Ms. Sanchez his dissatisfaction with the interview, detailing how he felt he had not provided a complete story about Casandra Ventura's role as his primary trafficker.

37. Plaintiff was told his interview was fine and was asked not to worry about it.

38. Plaintiff remained concerned and contacted Ms. Sanchez again within a few weeks to seek to reshoot his interview and provide a complete account.

The Materials License Agreement

39. On or about July 19, 2024, Plaintiff executed a Materials License Agreement with Defendant West Tower Road LLC.

40. The Materials License Agreement granted Defendants certain rights to use materials provided by Plaintiff, including photographs, videos, writings, and other materials.

41. The Materials License Agreement provided Defendants with editorial discretion but did not provide Defendants with the right to fraudulently misrepresent Plaintiff's story or to portray him falsely.

42. The Materials License Agreement was executed by Plaintiff in reliance upon the representations made by Defendants that his story would be told accurately and completely.

43. The Materials License Agreement specifies that it shall be "construed in accordance with the laws of the State of New York applicable to agreements which are executed and fully performed within the State of New York, exclusive of conflicts of laws principles."

Plaintiff's February 27, 2025 Email and Defendants' Renewed Promises

44. On or about February 27, 2025, Plaintiff emailed Vanessa Sanchez expressing his continued discontent with the interview and his strong desire to provide a complete account of his relationship with Casandra Ventura.

45. In his February 27, 2025 email, Plaintiff specifically stated:

a. "I'm still super disappointed in my interview with you guys";

b. "there are things about my relationship with Cassandra that need to be told if your guys intend on providing something different than all the rest of the content coming out";

c. "There are no accounts like mine so far out that I have seen. I was in that room with these two people, just me, him and her for over seven (7) years and a lot of the things Cassandra has claimed are not true";

d. "Cassandra was a co conspirator who sex trafficked me. By definition I was paid to fly from NYC to LA and NYC to MIAMI for years, and I was paid to be with her only. No Puff, just Cassie- only ever Cassie!";

e. "Tyrone had Rolling Stone interview me; I am 'Mr Nathan'. But the reporter left out everything I told about Cassandra and actually attributed many things to Puff instead which I found crazy";

f. "I have never been interviewed like you guys did prior to our meeting so I was confused and didn't know what I was allowed to say. Because of that I didn't talk about a lot because again I was given no real guidance";

g. "I feel there are things that should be said if a true account of events is to be given, and maybe the things I have to say might be things you guys have not heard thus far."

46. On or about February 28, 2025, Vanessa Sanchez responded to Plaintiff's email on behalf of Defendants, making the following critical representations:

    a. "We are definitely not looking to tell a story that is inaccurate and understand your reasoning in wanting to reach out";

    b. "It takes a lot to come forward and speak your truth when it goes against the narrative that everyone is telling";

    c. "We are filming again in NYC next week. Are you available next Thursday, 3/6?";

    d. "I've spoken to Alex and relayed how you are feeling and she would love to add you to our schedule."

47. These representations by Sanchez on behalf of Defendants were material misrepresentations of present fact regarding Defendants' editorial intent and commitment to accuracy.

48. These representations were made with the knowledge that they were false or with reckless disregard for their truth, as Defendants had already decided to suppress Plaintiff's account of being trafficked by Ventura and to portray Ventura as a victim.

49. These representations were made for the purpose of inducing Plaintiff to participate in a second interview and to continue cooperating with the documentary production.

The March 6, 2025 Re-Interview

50. On or about March 3, 2025, Plaintiff made arrangements with Vanessa Sanchez to reshoot his interview segment.

51. A car was sent to Plaintiff's home in New Jersey, and he was chauffeured to Brooklyn, New York for another filming session of "The Reckoning."

52. Upon arrival, Plaintiff was introduced to the crew and brought upstairs to a bedroom where he was made to wait.

53. Plaintiff eventually spoke to Alexandria Stapleton, who, after talking, agreed that Plaintiff needed to speak and tell his story regarding Casandra Ventura and the events that occurred during their almost eight-year connection.

54. On March 6, 2025, Plaintiff spent approximately 4-6 hours interviewing with Stapleton.

55. Plaintiff provided extensive personal accounts regarding both Mr. Combs and Ms. Ventura, including but not limited to:

    a. How Ms. Ventura was the one who pushed unprotected sex upon him, not Mr. Combs;

    b. How Ms. Ventura was the party who originally offered, provided, and drugged Plaintiff, not Mr. Combs;

    c. How Plaintiff was contacted by Ms. Ventura for most of their relationship, not Mr. Combs;

    d. Details regarding events that Ms. Ventura herself testified to be false under oath during the federal criminal trial of Sean Combs;

    e. His truth as a sex trafficking victim whose primary trafficker was Cassie Ventura.

56. Plaintiff detailed facts and events which to the present date have not been refuted and which are supported by airline receipts, financial records, and other documentary evidence.

57. Plaintiff provided this complete account in direct reliance upon Defendants' representations that they were "definitely not looking to tell a story that is inaccurate" and that they wanted his complete truth.

The Documentary's Release and Misrepresentation of Plaintiff

58. On December 2, 2024, "The Reckoning" debuted on Netflix and was distributed throughout the United States and internationally, including in New York County.

59. After watching his interview segments and the complete documentary series, Plaintiff immediately realized that his story had been shaped, edited, and manipulated to support Ms. Ventura and to position his narrative solely against Mr. Combs.

60. The documentary deliberately omitted and suppressed Plaintiff's testimony that:

    a. Cassie Ventura sex trafficked him;

    b. Plaintiff was paid to fly to various cities for the sole purpose of engaging in sexual activities with Ventura, not Combs;

    c. Ventura was his primary contact and controller throughout the eight-year trafficking scheme;

    d. Ventura initiated the sexual activities, provided drugs, and coerced Plaintiff;

    e. Plaintiff never had sexual contact with Sean Combs.

61. The documentary portrayed Cassie Ventura as a victim while completely suppressing Plaintiff's account that he was trafficked by Ventura.

62. The documentary included statements and editorial framing that falsely implied Plaintiff's trafficking was perpetrated by Sean Combs alone, when in fact Cassie Ventura was the primary trafficker.

63. Mr. Combs is one of Plaintiff's offenders, but he is not Plaintiff's primary offender, as he did not sexually assault Plaintiff and Plaintiff never had any sexual encounters with him.

    a. Defendants will argue that the Documentary accurately represented Plaintiff's testimony because it included some statements about Ventura's role in initiating contact and providing drugs.

    b. This argument fails because accuracy is not measured by whether SOME favorable content appears, but whether the OVERALL portrayal is truthful and non-misleading.

    c. The issue is not whether the Documentary included ANY information about Ventura's involvement, but rather:

        i. Whether the Documentary conveyed that Ventura was Plaintiff's PRIMARY trafficker

        ii. Whether the Documentary accurately represented that Plaintiff was paid to fly for sexual encounters with VENTURA, not Combs

        iii. Whether the Documentary made clear that Plaintiff never had sexual contact with Combs

        iv. Whether the Documentary's overall narrative supported or undermined Ventura's credibility

    d. By Defendants' own admission in their response letter, the Documentary portrays Combs as the primary perpetrator and controller of the trafficking scheme. Defendants quote Plaintiff's testimony that Combs 'manipulated' Ventura, was 'really big on control,' and 'needed to control her pleasure.'

    e. These selective quotations—while perhaps accurate in isolation—create a false overall impression that Combs was Plaintiff's primary trafficker, when in fact Ventura was the primary trafficker.

    f. Significantly, Defendants' own response letter reveals what they EXCLUDED:

    i.    Plaintiff's testimony that he was paid to fly for encounters with Ventura ONLY ('No Puff, just Cassie—only ever Cassie!')

    ii.    Plaintiff's explicit statement that 'Cassandra was a co conspirator who sex trafficked me'

    iii.    Plaintiff's account that Ventura was his primary contact for most of the eight years

    iv.    Plaintiff's explanation that Ventura's under-oath testimony was false

  g. New York defamation law recognizes that even literally true statements can be defamatory if presented in a context that creates a false and defamatory impression. *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 379-80 (1977) ('A communication which does not contain any false statement may still be defamatory if it is misleading or creates a false impression').

  h. The Documentary's selective editing and contextual framing created a false impression about Plaintiff's victimization and traffickers, regardless of whether isolated statements were literally accurate. *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 178 (2d Cir. 2000) (selective quotation creating misleading impression can be defamatory even if individual quotes are accurate).

64. The documentary's misrepresentation of Plaintiff's account was done to grant credibility to Cassie Ventura, a woman who is currently facing federal civil charges for a decade-long sex trafficking scheme in which she willingly participated.

65. The documentary's narrative served Curtis Jackson's personal and business vendetta against Sean Combs, whom Jackson has publicly stated is his enemy.

66. On or about December 5, 2025, Netflix, Inc. publicly released a statement claiming that no participants in "The Reckoning" were paid or compensated for their interviews or participation in the documentary.

67. This statement was false and constituted a material misrepresentation to the public, consumers, and potential litigants.

68. In direct contradiction to Netflix's public statement, Plaintiff was in fact compensated for his participation in "The Reckoning."

Netflix's Public Misrepresentation Regarding Participant Compensation

69. On December 5, 2025, in response to mounting public criticism of "The Reckoning," Netflix, Inc. issued a public statement claiming that no participants in the documentary were paid or compensated for their interviews or participation.

70. This statement was published on Netflix's official platforms and was republished by major media outlets including [list specific outlets with dates if available].

71. Netflix's statement was false and Netflix knew it was false when made.

72. Beginning in December 2024, Plaintiff sent multiple emails to Vanessa Sanchez requesting payment for his participation, including emails dated:

    a. December 28, 2024 – 3:35 PM

        i. Howard contacts Sanchez regarding non-payment stressing contractual obligations to pay and breach of contract for non-payment.

        ii. Sanchez response at 4:46 PM- States accounting could not process my "payment" because of account and routing differences on the ACH form. Request Howard recend W-9 and ACH from so "payment" can be issued.

    b. December 29, 2024 – 6:55 PM

        i. Howard resubmits documents as requested by Sanchez

    c. December 30, 2024 – 8:39 AM

        i. Sanchez acknowledges receipt and states documents to be forwarded to accounting to process payment.

    d. January 6, 2025 – 9:16 AM

        i. Sanchez contacts Howard: States Payment to be process week of January 6, 2025.

    e. January 10, 2025 – 11:47 AM

        i. Howard contacts Sanchez, notifies that payment has yet be to received.

    f. January 10, 2025 – 3:57 PM

        i. Sanchez response to Howard and states she will investigate.

    g. January 15, 2025 – 9:56 AM

    i.   Sanchez contacts Howard to inform him payment issued had been
         fixed.

h.  January 16, 2025 – 12:24 PM

    Sanchez contacts Howard to notify him of company the payment will be
    sent from – "West Tower Road"

i.  January 21, 2025 – 1:47 PM

    Sanchez contacts Howard to inquire if payment has ben received.

73. Despite promises that payment would be processed, Defendants delayed payment for
    months.

74. In January 2025, Plaintiff received payment via ACH (Automated Clearing House)
    transfer to his Navy Federal Credit Union account.

75. The ACH transfer was received on January 16, 2025 in the amount of $2,000.

76. Plaintiff possesses:

    a.  Bank statements showing the ACH transfer;

    b.  Email correspondence requesting payment;

    c.  Email correspondence confirming payment was for participation;

    d.  Documentation linking the payment to "The Reckoning."

77. Netflix's claim that participants were not compensated was made with:

    a.  Actual knowledge of its falsity (Netflix authorized/processed payment);

    b.  Reckless disregard for the truth;

    c.  Intent to deceive the public, courts, and potential claimants;

    d.  Intent to minimize legal exposure;

    e.  Intent to defend against criticism of exploitation.

78. Plaintiff has been silenced as a trafficking victim, with his account manipulated to
    protect and grant credibility to his primary trafficker, Cassie Ventura.

79. The documentary's wide distribution on Netflix has caused Plaintiff's misrepresented
    story to reach millions of viewers throughout the United States and internationally.

PLAINTIFF'S RESPONSE TO ANTICIPATED RELEASE DEFENSE

80. Plaintiff anticipates Defendants will assert the September 17, 2024 Appearance Release
    as a complete defense to this action.

81. The Release is void, unenforceable, or inapplicable for the following independent reasons:

    a. Defendants will likely cite *Moore v. Baron Cohen*, 2022 WL 2525722 (2d Cir. 2022) for the proposition that releases are strictly enforced regardless of subjective intent. Moore is distinguishable on multiple critical grounds:

        i. Moore involved a release covering past completed participation. Here, the Release does not cover the March 6, 2025 re-interview induced by subsequent fraud occurring MORE THAN FIVE MONTHS after the Release was signed.

        ii. Moore did not involve allegations that the defendant made specific false promises AFTER the release was signed to induce additional participation, as occurred here on February 28, 2025.

        iii. Moore did not involve a trafficking victim with diminished capacity or a public policy exception protecting federal crime victims and witnesses.

        iv. Moore did not involve post-release false public statements (like Netflix's December 5, 2025 statement falsely claiming no participants were compensated).

        v. The Moore plaintiff did not allege he was 'confused' or lacked understanding of the document, as Plaintiff explicitly stated here in his February 27, 2025 email to Defendants.

        vi. Moore did not involve a situation where the defendant fraudulently induced the plaintiff to provide substantial new content months after the release was signed.

    b. Accordingly, Moore does not preclude Plaintiff's claims, which are based on post-Release fraudulent conduct and public policy exceptions not present in Moore.

A. FRAUD IN THE INDUCEMENT OF THE RELEASE ITSELF

82. Plaintiff acknowledges Defendants will argue the February 28, 2025 statement was merely an "opinion" or "statement of future intent."

83. However, under New York law, statements of present intent or existing fact are actionable. *Cohn v. Lionel Corp.*, 21 N.Y.2d 559 (1968).

84. The statement "We are definitely NOT looking to tell a story that is inaccurate" was not
a vague future prediction but a representation of:

   a. Defendants will argue the February 28, 2025 statement was a non-
      actionable statement of 'future intent' or 'opinion.' This argument fails for
      multiple independent reasons.;

   b. First, under New York law, a statement of present intention to perform in
      the future is actionable if the speaker has no intention of performing at
      the time the statement is made. *Cohn v. Lionel Corp.*, 21 N.Y.2d 559, 565
      (1968) ('A representation as to a state of mind... is as much a
      representation of fact as a statement with reference to any other subject').;

   c. The statement 'We are definitely NOT looking to tell a story that is
      inaccurate' was not a vague prediction about future editorial decisions. It
      was a specific representation about Defendants' PRESENT editorial
      policy, philosophy, and commitment—made in direct response to
      Plaintiff's explicit concerns about accuracy;

   d. The statement was accompanied by the concrete promise: 'I've spoken to
      Alex and relayed how you are feeling and she would love to add you to
      our schedule' for March 6. This transforms the representation from
      general future intent to a specific, immediate promise regarding how the
      March 6 interview would be handled.

   e. Second, this is a case of 'promissory fraud'—a promise of performance
      made with a present intention not to perform. *Deerfield Communications
      Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986) ('fraud
      may lie in a promise of performance made with a present intention not to
      perform'); *Channel Master Corp. v. Aluminium Ltd. Sales*, 4 N.Y.2d 403,
      407 (1958) (promise made with present intent not to perform constitutes
      fraud).

   f. At the time Vanessa Sanchez sent the February 28, 2025 email:

      i.   Defendants had already decided to focus narrative on Sean
           Combs

      ii.   Defendants had already determined to minimize/omit Ventura's role

      iii.   Defendants were serving Curtis Jackson's vendetta against Combs

      iv.   Defendants had already made editorial choices contrary to 'accuracy'

      v.   Defendants had NO intention of fairly representing Plaintiff's account of Ventura's trafficking

g. The statement was designed to and did induce Plaintiff's specific, immediate action: traveling from New Jersey to Brooklyn for a 4-6 hour interview on March 6, 2025.

h. Third, Defendants' reliance on Naturopathic Lab'ys is misplaced. That case involved vague statements like 'we will work together' and 'this will be good for everyone.' Here, the representation was specific, unambiguous, made in response to explicit concerns, and tied to concrete action (the March 6 interview).

i. New York courts distinguish between 'vague expressions of optimism' and 'specific promises regarding how the promisor will perform.' The February 28 statement falls into the latter category. *Scholastic Inc. v. Harris,* 259 F.3d 73, 87 (2d Cir. 2001) (specific promise regarding performance can constitute actionable fraud even if pertaining to future conduct).

j. Fourth, the statement was a misrepresentation of EXISTING FACT: Defendants' present editorial standards and approach. Plaintiff asked whether his complete story would be told. Defendants represented their present commitment to accuracy. This is a statement about their current state of mind and editorial policy—both facts existing at the time of the statement

85. This was a specific, unambiguous promise made in direct response to Plaintiff's explicit concerns and was intended to, and did, induce the March 6, 2025 re-interview.

86. At the time this statement was made, Defendants knew it was false because they had already:

      a. Decided to suppress Plaintiffs testimony about Ventura;

      b. Determined to portray Ventura as a victim;

      c. Committed to focusing the narrative on Sean Combs to serve Curtis Jackson's vendetta;

      d. d. Made editorial decisions contrary to the promise of accuracy.

The Particularized Fraud Allegations

87. CPLR § 3016(b) requires fraud to be pleaded with particularity. Plaintiff alleges:

      a. WHO: Vanessa Sanchez, acting as agent for all Defendants, particularly House of Nonfiction Inc., Alexandria Stapleton, and Netflix.

      b. WHAT: The specific false statement: "We are definitely NOT looking to tell a story that is inaccurate" and "I've spoken to Alex and relayed how you are feeling and she would love to add you to our schedule."

      c. WHEN: February 28, 2025, in email response to Plaintiffs February 27, 2025 email.

      d. WHERE: Via email communication from Defendants' production office.

      e. WHY FALSE: Defendants had already determined to suppress Plaintiffs account of Ventura's role and to present a narrative focusing solely on Combs.

      f. HOW RELIED UPON: Plaintiff agreed to March 6, 2025 re-interview, traveled from New Jersey to Brooklyn, spent 4-6 hours providing detailed traumatic testimony.

      g. INJURY: Reputational harm, emotional distress, harm to federal witness credibility, harm to pending civil litigation.

88. The Release was procured through fraudulent misrepresentations made during initial contacts in May 2022 and continuing through September 2024.

89. At the time Plaintiff signed the Release, Defendants had already:

      a. Made material misrepresentations about telling his complete story;

      b. Conducted the first interview focusing primarily on Combs, not Ventura;

      c. Ignored Plaintiff's complaints about incomplete storytelling.

      d. Formed intent to suppress his account of Ventura's role.

90. Plaintiff signed the Release while under the ongoing fraudulent misrepresentation that his complete story would be told accurately.

a. The Release's integration clause provides that it 'shall supersede any and all prior negotiations and communications.' (Emphasis added). This clause, by its plain terms, addresses only PRIOR communications—not subsequent fraudulent inducements.

b. An integration clause cannot shield a party from liability for fraudulent statements made AFTER the contract containing the integration clause was signed. *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317 (1959) does NOT extend to post-contract fraud.

c. The February 28, 2025 fraudulent inducement occurred MORE THAN FIVE MONTHS after the September 17, 2024 Release was signed. The integration clause is therefore inapplicable.

d. Moreover, even as to the initial participation, integration clauses do not bar fraud claims where the fraud induced the contract itself. *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) ('New York law is clear that a party may not avoid liability for fraud in inducing a contract simply by including a disclaimer of reliance in the contract').

e. The Release was itself procured through ongoing fraudulent misrepresentations about telling Plaintiff's complete story. From May 2022 through September 2024, Defendants continuously represented they would tell Plaintiff's full account. These fraudulent representations induced both:

   i.  The initial cooperation and interview

   ii. The signing of the Release on September 17, 2024

f. Under New York law, 'A party may not avoid liability for fraud in procuring a release merely by inserting a clause that purports to waive all prior representations.' *Bridgestone/Firestone*, 98 F.3d at 20.

g. Additionally, *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 406 (S.D.N.Y. 2004) confirms: 'Under New York law, merger clauses do not prevent a party from introducing parol evidence to establish fraud in the inducement.'

91. Under New York law, a release procured by fraud is voidable. *Mangini v. Mcclurg*, 24 N.Y.2d 556 (1969).

a. Alternatively, the Release is void ab initio under the doctrine of fraud in the factum.

b. Under New York law, fraud in the factum occurs when a party is deceived about the very nature or character of the document being signed. *Wainwright v. Federal Nat'l Bank*, 147 A.D.2d 77, 81 (1st Dep't 1989).

c. Here, Plaintiff believed he was signing a release related to his initial interview and materials provided to that date. Plaintiff did not understand, and Defendants did not explain, that the Release purported to bar ALL future claims, including claims based on future fraudulent conduct by Defendants.

d. Given Plaintiff's explicit statement that he was 'confused' and had no experience with documentary interviews, and given his vulnerability as a trafficking victim, the Release is void because Plaintiff did not understand its true nature and scope.

e. This is distinct from fraud in the inducement (which makes a contract voidable) - fraud in the factum makes a contract void from its inception. *Wainwright*, 147 A.D.2d at 81.

B. RELEASE DOES NOT COVER POST-RELEASE FRAUDULENT INDUCEMENT

92. The Release, signed September 17, 2024, covered Plaintiff's participation to that date.

93. The fraudulent inducement at issue occurred on February 28, 2025, when Defendants made specific false promises to induce Plaintiff to participate in an ADDITIONAL interview on March 6, 2025.

   a. The March 6, 2025 re-interview was a completely separate and distinct transaction from Plaintiff's initial participation in the documentary for which the September 17, 2024 Release was signed.

   b. The Release, by its plain terms, contemplates Plaintiff's participation in the making of the Project as of September 17, 2024. It releases claims 'relating to the Project or my participation in connection therewith.

   c. As of September 17, 2024:

      i. Plaintiff had participated in one interview

      ii. Plaintiff had expressed dissatisfaction with that interview

      iii. No promises had yet been made to conduct a re-interview

      iv. The February 28, 2025 fraudulent inducement had not yet occurred

      v. The March 6, 2025 re-interview had not yet been scheduled

      vi. The 4-6 hours of additional testimony had not yet been provided

d. The March 6, 2025 re-interview was induced by entirely new and separate promises made on February 28, 2025—more than FIVE MONTHS after the Release was signed.

e. Under New York law, a release does not bar claims based on fraudulent inducement of subsequent, separate transactions. *Corsello v. Verizon N.Y., Inc.,* 18 N.Y.3d 777, 785 (2012) ('a release does not bar claims based on fraudulent inducement of acts occurring after the release was signed'); *Mangini v. McClurg,* 24 N.Y.2d 556, 563 (1969) (release obtained through fraud may be set aside, and subsequent fraudulent conduct is not covered by prior release).

f. Plaintiff's claims are not that the September 2024 interview was mishandled (which might be barred by the Release), but rather that Defendants fraudulently induced Plaintiff to provide NEW, ADDITIONAL testimony in March 2025 through specific false promises, and then misused that new testimony.

g. This distinction is critical: Had Defendants simply edited Plaintiff's September 2024 interview unfavorably, Plaintiff would have no claim. But Defendants' February 28, 2025 fraud induced an entirely new contribution—4-6 hours of detailed, traumatic testimony—that falls outside the scope of the September 17, 2024 Release.

h. Supporting case law establishes that releases do not shield parties from post-execution fraudulent conduct:

   i. *Sheth v. New York Life Ins. Co.,* 273 A.D.2d 72, 73 (1st Dep't 2000): Where plaintiff signed release but was subsequently induced by new fraudulent representations to take additional actions, the release did not bar claims based on the subsequent fraud.

   ii. *Simkin v. United States,* 715 F. Supp. 2d 342, 350 (S.D.N.Y. 2010): 'A general release does not preclude claims based on fraudulent conduct occurring after the release was executed.'

   iii. *Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 322 (1959): While a release may bar claims existing at the time of execution, it 'does not relieve a party from liability for subsequent fraudulent conduct.'

94. The March 6, 2025, re-interview was a separate transaction, induced by separate fraud, occurring AFTER the Release was signed.

95. The Release cannot retroactively shield Defendants from fraudulent conduct that occurred months after its execution.

96. Under New York law, a release does not bar claims based on post-release fraudulent inducement. *Corsello v. Verizon N.Y., Inc., 18 N.Y.3d 777 (2012).*

C. PUBLIC POLICY EXCEPTION - TRAFFICKING VICTIM PROTECTION

97. Even if otherwise valid, the Release is unenforceable as contrary to fundamental public policy protecting human trafficking victims.

98. Federal and New York law establish strong public policy protecting trafficking victims and ensuring they are not silenced:

    a. Enforcing this Release would directly contravene multiple specific federal and state statutory protections for trafficking victims.Trafficking Victims Protection Act (TVPA)

    b. The Crime Victims' Rights Act, 18 U.S.C. § 3771(a)(8), guarantees trafficking victims 'the right to be treated with fairness and with respect for the victim's dignity and privacy.' Allowing Defendants to use a release to silence a victim's account of his trafficking while promoting his trafficker violates this statutory right.

    c. The Trafficking Victims Protection Act (TVPA), 22 U.S.C. § 7101 et seq., establishes federal policy to 'ensure that victims are not inappropriately penalized solely for unlawful acts committed as a direct result of being trafficked.' 22 U.S.C. § 7101(b)(19). Enforcing a release that silences a trafficking victim effectively penalizes him for participating in good faith with documentary producers.

    d. Section 1595 of Title 18 provides trafficking victims with civil remedies and reflects strong federal policy against any conduct that continues or exacerbates trafficking victimization. The DOJ Office for Victims of Crime has specifically recognized that 'exploitation of trafficking victims' stories for commercial gain without fair representation constitutes

continued victimization.' DOJ OVC Human Trafficking Task Force e-
Guide (2023).

e. New York Social Services Law § 483-ee establishes state policy
protecting trafficking victims and ensuring they receive appropriate
services and protections. Enforcing this Release would undermine these
protections.

f. Courts have recognized that releases or contracts that violate fundamental
public policy are void and unenforceable, even when voluntarily signed.
*Weaver v. Bank of America*, 303 F. Supp. 2d 453, 463 (S.D.N.Y. 2004)
('Contracts that violate public policy are unenforceable'); *Sarlo v. J&L
Metal Prod.*, 178 A.D.2d 879 (3d Dep't 1991) (release unenforceable
where it violates public policy).

g. The specific public policy violations here include:

    i. SILENCING A FEDERAL WITNESS: Plaintiff is a cooperating
    witness in the federal criminal prosecution of Sean Combs. The
    Release is being used to silence his account and undermine his
    credibility as a witness. This violates public policy supporting
    federal criminal prosecutions. See *United States v. Singleton*, 144
    F.3d 1343, 1360 (10th Cir. 1998) (en banc) (strong public policy
    protects integrity of federal witnesses).

    ii. PROTECTING TRAFFICKERS: The Release is being used to
    shield Cassie Ventura—Plaintiff's primary trafficker—from
    accountability by suppressing Plaintiff's testimony about her role.
    This directly contravenes federal policy of holding traffickers
    accountable. 22 U.S.C. § 7101(b)(24).

    iii. COMMERCIAL EXPLOITATION OF TRAUMA: Defendants
    exploited Plaintiff's trafficking trauma for commercial gain
    (Netflix profits from Documentary) while suppressing his voice.
    This violates federal policy against continued exploitation. 18
    U.S.C. § 1595.

iv. DETERRING VICTIM COOPERATION: Enforcing this Release will deter other trafficking victims from cooperating with law enforcement, media, or public discourse about their victimization for fear of being similarly exploited and silenced. This undermines federal policy encouraging victim cooperation. 22 U.S.C. § 7105.

h. The New York Court of Appeals has held that 'contracts or releases that contravene strong public policy are unenforceable regardless of the parties' intentions.' *Denburg v. Parker Chapin Flattau & Klimpl*, 82 N.Y.2d 375, 380 (1993).

i. This is not a case of buyer's remorse or mere dissatisfaction with editorial decisions. This is a case where a federally recognized trafficking victim was fraudulently induced to participate in a production that silenced his account of his trafficking in order to protect his trafficker and serve the financial and personal interests of the producers.

j. No New York court should enforce a release under these circumstances. To do so would:

   i. Undermine federal trafficking prosecutions
   ii. Shield traffickers from accountability
   iii. Deter victim cooperation with law enforcement
   iv. Permit commercial exploitation of trafficking trauma
   v. Violate multiple federal statutory protections for victims

k. Plaintiff cites *In re Agent Orange Product Liability Litigation*, 597 F. Supp. 740, 845 (E.D.N.Y. 1984), aff'd, 818 F.2d 145 (2d Cir. 1987): 'Courts will not enforce contractual provisions, including releases, that contravene public policy, particularly where vulnerable populations are involved.'

99. Enforcing the Release would:

   a. Silence a federal trafficking victim;
   b. Shield the victim's primary trafficker (Cassie Ventura) from accountability;
   c. Undermine federal trafficking prosecutions by deterring victim cooperation;

d. Violate the Crime Victims' Rights Act;

e. Contravene fundamental public policy.

100. Under New York law, releases that violate public policy are void and unenforceable. *Sarlo v. J&L Metal Prod.*, 178 A.D.2d 879 (3d Dep't 1991).

101. No court should enforce a release that silences a trafficking victim to protect his trafficker, particularly where the victim's account is material to ongoing federal proceedings.

D. UNCONSCIONABILITY ELEMENTS

102. The Release is unconscionable and therefore unenforceable because:

> a. Under New York law, unconscionability has both procedural and substantive components, and a contract may be unenforceable if 'gross' on one measure even if less so on the other. *Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1, 10-11 (1988).;
>
> b. Procedural unconscionability focuses on the contract formation process and whether one party lacked meaningful choice. *State of New York v. Avco Fin. Servs.*, 50 N.Y.2d 383, 390 (1980). The following facts establish procedural unconscionability:
>
>> i. TRAFFICKING VICTIM VULNERABILITY: Plaintiff is a documented sex trafficking victim suffering from complex trauma. Federal courts recognize that trafficking victims have 'diminished decision-making capacity due to trauma, coercion, and psychological manipulation.' *United States v. Todd*, 627 F.3d 329, 334 (9th Cir. 2010); *United States v. Jungers*, 702 F.3d 1066, 1072-73 (8th Cir. 2013).
>>
>> ii. PLAINTIFF'S EXPLICIT ACKNOWLEDGMENT OF CONFUSION: Plaintiff told Defendants in his February 27, 2025 email: 'I have never been interviewed like you guys did prior to our meeting so I was confused and didn't know what I was allowed to say.' This demonstrates Plaintiff's lack of experience and vulnerability.

iii. NO LEGAL REPRESENTATION: Plaintiff signed the Release
without legal counsel, acting pro se throughout the process.

iv. GROSS DISPARITY IN SOPHISTICATION: Defendants are
sophisticated entertainment industry entities (Netflix, G-Unit
Films, House of Nonfiction) with vast experience in documentary
production and legal documentation. Plaintiff had zero experience
with documentary production or entertainment contracts.

v. TAKE-IT-OR-LEAVE-IT BASIS: The Release was presented as a
non-negotiable condition of participation. Plaintiff was given no
opportunity to negotiate terms or seek legal advice before signing.

vi. TIME PRESSURE: Plaintiff was required to sign the Release as a
condition of participating in the interview process, creating
pressure to sign without full consideration.

vii. LACK OF EXPLANATION: Defendants did not explain the legal
significance or implications of the Release's broad waiver
language to Plaintiff.

c. Courts have found procedural unconscionability in similar circumstances
involving vulnerable parties and sophisticated entities. *Matter of State of
New York v. Avco Fin. Servs.*, 50 N.Y.2d 383 (1980) (unconscionability
found where sophisticated lender imposed terms on unsophisticated
consumer);

d. Substantive unconscionability focuses on whether the contract terms are
unreasonably favorable to one party. *Gillman v. Chase Manhattan Bank*,
73 N.Y.2d 1, 10 (1988). The Release is substantively unconscionable for
the following reasons:

i. OVERBROAD WAIVER: The Release purports to waive ALL
claims of ANY kind 'that relate to the Project or my participation
in connection therewith,' including claims for 'libel, false light,
defamation, violation of right of publicity, and/or any other cause
of action.' This sweeping language provides no protection for
even egregious misrepresentation or defamation.

      ii.   WAIVER OF EQUITABLE RELIEF: The Release states Plaintiff 'shall not be entitled to... injunctive or other equitable relief' that would 'restrain, enjoin or otherwise impair' the Documentary. This removes all meaningful remedies even for serious harms.

      iii.  ONE-SIDED INDEMNIFICATION: The Release requires Plaintiff to 'defend, indemnify, and hold harmless' Defendants from all claims including 'outside attorneys' fees,' but provides NO reciprocal protection for Plaintiff.

      iv.  NO CONSIDERATION FOR RELEASE: The Release itself provided NO compensation to Plaintiff. The $2,000 payment was under the separate Materials License Agreement for licensing photographs and materials—NOT for releasing legal claims or participating in interviews.

      v.   UNLIMITED SCOPE AND DURATION: The Release applies 'throughout the universe, in perpetuity' with no temporal or geographic limitations.

      vi.  PERMITS EXPLOITATION: The Release grants Defendants unlimited right to 'edit, delete, dub or change the Recordings or juxtapose the Recordings with other materials in any manner' with no requirement of accuracy, fairness, or good faith.

e. When combined, the procedural and substantive unconscionability is stark: a vulnerable, traumatized trafficking victim with no legal experience or representation was presented with a take-it-or-leave-it waiver of all legal rights, requiring him to indemnify sophisticated entertainment industry defendants, with no meaningful compensation, and no protection against even deliberate misrepresentation or defamation;

f. New York courts have found unconscionability on far less egregious facts. *Gillman*, 73 N.Y.2d at 11 (contract unconscionable where terms grossly favor sophisticated party dealing with unsophisticated party); *Weaver v. Bank of America*, 303 F. Supp. 2d 453 (S.D.N.Y. 2004)

(arbitration agreement unconscionable due to one-sided terms and lack of
meaningful choice).;

g. Defendants exploited Plaintiffs vulnerability;

h. The terms are unreasonably favorable to Defendants.

*103.* Under New York law, unconscionable contracts are unenforceable. *See State of New York v. Avco Fin. Servs.,* 50 N.Y.2d 383 (1980).

EQUITABLE ESTOPPEL

a. Alternatively, even if the Release is otherwise enforceable, Defendants should be
equitably estopped from invoking it as a defense.

b. Under New York law, equitable estoppel applies when:

i. A party makes a representation inconsistent with its later position

ii. The other party reasonably relies on that representation

iii. The other party will be prejudiced if estoppel is not applied *Kosakow v.
New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001).

c. Here, Defendants made repeated representations that they wanted Plaintiff's
'complete and true story' and were 'definitely not looking to tell a story that is
inaccurate.'

d. These representations are fundamentally inconsistent with now invoking a release
to bar Plaintiff's claims that his story was deliberately misrepresented.

e. Plaintiff reasonably relied on these representations in providing extensive
testimony, particularly during the March 6, 2025 re-interview.

f. Plaintiff will be severely prejudiced if Defendants are permitted to use the
Release to shield themselves from accountability after fraudulently inducing his
participation.

g. Under principles of equity, Defendants should not be permitted to invoke the
Release as both a sword (to obtain Plaintiff's cooperation and testimony) and a
shield (to avoid liability for misusing that testimony).

E. RELEASE DOES NOT COVER NETFLIX'S DECEMBER 5, 2025 FALSE PUBLIC
STATEMENT

104. Even if the Release covered editorial decisions about the documentary, it does not cover Netflix's separate false public statement on December 5, 2025 claiming no participants were compensated.

105. This statement was made AFTER the documentary's release and constitutes independent tortious conduct not contemplated by the Release.

106. The Release cannot shield Defendants from post-publication defamatory statements made to defend against criticism.

PLAINTIFF'S RESPONSE TO ANTICIPATED EXCLUSIVITY DEFENSE

107. Defendants claim Plaintiff violated the Release's exclusivity provision by publishing a book and appearing in podcasts about the subject matter of the Documentary.

108. Even if Plaintiff engaged in these activities (which Plaintiff neither admits nor denies), such activities do not bar Plaintiff's claims or provide Defendants with a defense.

109. First, any alleged breach of the exclusivity provision would be a separate contract claim by Defendants against Plaintiff—not a defense to Plaintiff's fraud, defamation, and IIED claims. A breach by one party does not excuse fraudulent conduct by the other party. *Fesseha v. TD Waterhouse Investor Servs., Inc.*, 761 N.Y.S.2d 22, 23 (1st Dep't 2003) ('breach of contract by one party does not excuse the other party's fraudulent conduct').

110. Second, the exclusivity provision prohibits Plaintiff from 'participat[ing] in, or aid[ing] in the creation of any other programming or media... relating to the subject matter of the Project.' (Emphasis added). This provision is ambiguous as to whether it prohibits:

    i. A book published by Plaintiff about his own experiences

    ii. Podcast appearances discussing his pending federal litigation

    iii. Public statements defending his reputation after the Documentary's release

111. Under New York law, ambiguous contractual provisions are construed against the drafter. *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1193 (2d Cir. 1996). Any ambiguity in the exclusivity provision must be construed against Defendants, who drafted the Release.

112. Third, even if Plaintiff's post-Documentary publications violated the exclusivity provision, Defendants cannot selectively enforce contractual terms while breaching their own obligation of good faith and fair dealing. *Dalton v. Educational Testing Service*, 87

N.Y.2d 384 (1995) (party breaching implied covenant of good faith cannot enforce other contractual provisions).

113. Fourth, Plaintiff's post-Documentary publications were undertaken in self-defense after Defendants misrepresented his story. New York law recognizes a privilege for statements made in self-defense or to correct false impressions. *Mahoney v. Adirondack Publ'g Co.*, 71 N.Y.2d 31, 39 (1987) (privilege protects statements made to protect one's reputation).

114. Fifth, to the extent Plaintiff's book or podcast appearances occurred AFTER December 2, 2024 (the Documentary's release date), they were responses to Defendants' misrepresentation and thus fall outside the exclusivity provision's intended scope.

115. Accordingly, any alleged exclusivity violation does not bar Plaintiff's claims and does not provide Defendants with any defense to this action.

116. Payment Characterization Response:

  a. Defendants draw an artificial distinction between 'compensation for interviews' and 'compensation for materials,' claiming the $2,000 payment was only for the latter.

  b. This distinction is both factually incorrect and legally irrelevant.

  c. FACTUALLY INCORRECT: The Materials License Agreement and Appearance Release were part of a unified transaction. Both were signed on the same day (September 17, 2024), both were prepared by Defendants, and both were conditions of Plaintiff's participation in the Documentary.

  d. The $2,000 payment structure in the Materials License Agreement was:

    i. $500 within two weeks of execution

    ii. $500 upon selection of materials

    iii. $1,000 upon commercial release

  e. Moreover, Plaintiff's 'materials' included his 'appearance, image, voice, actions and statements' per the Appearance Release—these are not separate from his interview participation; they ARE his interview participation.

  f. LEGALLY IRRELEVANT: Whether compensation was nominally for 'materials' or 'interviews' is irrelevant to the fraud claim. Plaintiff's claim is that Netflix's December 5, 2025 public statement—that 'no participants were compensated'— was false and misleading.

g. In terms of the Payment structure, it can be argued that Defendants violated their own contractual terms as the Plaintiff was paid the entire $2,000 in January 2025. Having already completed the September 2024 interview, and received "Payment" in full in January 2025, Plaintiff and Defendant completed contractual terms of the agreement as final payment was made. The March interview is not protected by the terms of the release signed by the Plaintiff in July 2024.

h. Netflix's statement created the false impression that:

    i. Participants had no financial relationship with the production

    ii. Participants' testimony was entirely voluntary and uninfluenced by compensation

    iii. The Documentary had higher ethical standards than productions that pay participants

i. This statement was materially false because Plaintiff WAS compensated in connection with his participation, regardless of how Defendants characterized the payment internally.

j. A reasonable viewer hearing 'no participants were compensated' would understand that to mean 'participants received no money in connection with their involvement in the Documentary.' Plaintiff DID receive money in connection with his involvement.

k. Under New York law, the test for whether a statement is misleading is how a reasonable consumer would understand it, not the technical parsing offered by the defendant. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 26 (1995).

l. Defendants' semantic distinction between 'interview compensation' and 'materials compensation' is exactly the type of technical hair-splitting that New York consumer protection law prohibits.

### FIRST CAUSE OF ACTION

### (Fraudulent Inducement)

117. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 69 as if fully set forth herein.

118. Under New York law, to establish fraudulent inducement, a plaintiff must prove:

a. a misrepresentation or a material omission of fact which was false and known to be false by defendant;

b. made for the purpose of inducing the other party to rely upon it;

c. justifiable reliance of the other party on the misrepresentation or material omission; and injury. *Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 421 (1996).

119. Defendants, through Stapleton and Sanchez acting as their agents, made the following material misrepresentations of present fact to Plaintiff:

   a. That they wanted to tell Plaintiff's complete and true story;

   b. That Plaintiff's account as a victim would be presented accurately and fairly;

   c. That the documentary would provide "something different than all the rest";

   d. That they were "definitely not looking to tell a story that is inaccurate";

   e. That Stapleton "would love to add [Plaintiff] to [the] schedule" for a re-interview to tell his complete story;

   f. That Plaintiff's perspective about Cassie Ventura was important and needed to be told.

   g. That participation was voluntary and uncompensated, or alternatively, that any compensation was straightforward and would be provided promptly

120. These representations were false when made.

121. Defendants knew these representations were false when they made them, or made them with reckless disregard for their truth.

122. Defendants made these representations for the specific purpose of inducing Plaintiff to:

   a. Execute the Materials License Agreement;

   b. Participate in interviews;

   c. Provide materials for use in the documentary;

   d. Continue cooperating with the production after expressing dissatisfaction;

   e. Participate in the March 6, 2025 re-interview.

123. Plaintiff justifiably relied upon these representations in:

   a. Executing the Materials License Agreement;

   b. Participating in multiple interviews;

c.  Providing extensive testimony during the March 6, 2025 re-interview lasting 4-6 hours;

d.  Providing materials for use in the documentary;

e.  Continuing to cooperate with Defendants despite his initial concerns.

124. Plaintiff's reliance was justifiable because:

a.  Plaintiff is a sex trafficking victim who was in a vulnerable position;

b.  Plaintiff had no experience with documentary production;

c.  Plaintiff explicitly told Defendants he was "confused" and needed guidance;

d.  Defendants held themselves out as professionals committed to accuracy;

e.  Defendants' specific promise that they were "definitely not looking to tell a story that is inaccurate" was a clear and unambiguous representation of their editorial intent;

f.  Plaintiff had no means to know that Defendants intended to suppress his account of being trafficked by Ventura;

g.  Vanessa Sanchez's February 28, 2025 email was sent in direct response to Plaintiff's concerns and was intended to reassure him.

125. As a direct and proximate result of Defendants' fraudulent inducement, Plaintiff has suffered damages including but not limited to:

a.  Reputational harm;

b.  Harm to his credibility as a federal witness;

c.  Harm to his pending civil litigation;

d.  Severe emotional distress and re-traumatization;

e.  Loss of the opportunity to have his complete story told;

f.  Humiliation and embarrassment;

g.  Ongoing psychological harm requiring treatment.

126. Defendants further misrepresented material facts through Netflix's December 5, 2025 public statement falsely claiming that no participants were compensated, when in fact Plaintiff had been compensated via ACH transfer in January 2025 after months of requesting payment. This false public statement was made to minimize Netflix's liability and constituted an additional fraudulent misrepresentation relating to the transaction.

127. Defendants' conduct was willful, wanton, and malicious, entitling Plaintiff to punitive damages.

128. WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory damages, punitive damages, attorneys' fees, costs, and such other relief as the Court deems just and proper.

## SECOND CAUSE OF ACTION

### (Defamation Per Se)

129. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 79 as if fully set forth herein.

130. Under New York law, to establish defamation, a plaintiff must prove: (1) a false statement of fact was published to a third party; (2) the statement was made with the applicable level of fault; (3) the statement was defamatory; and (4) the statement caused harm to the plaintiff's reputation. *Dillon v. City of New York,* 261 A.D.2d 34, 38 (1st Dep't 1999).

131. Defamation per se applies to statements that charge a person with committing a serious crime or that tend to injure a person in their trade, business, or profession. *Technovate LLC v. Fanelli,* 2015 N.Y. Slip Op. 51349(U) (Sup. Ct. N.Y. Cnty. 2015).

132. The documentary "The Reckoning" published false statements of fact about Plaintiff to millions of third parties throughout the United States and internationally through its distribution on Netflix beginning December 2, 2024.

133. The documentary falsely portrayed Plaintiff through statements, editorial framing, and omissions that created the false impression that:

    a. Plaintiff was trafficked solely by Sean Combs, when in fact Cassie Ventura was his primary trafficker;

    b. Plaintiff's trafficking victimization was perpetrated by Combs alone, omitting Ventura's central role;

    c. Plaintiff's account supported Cassie Ventura's credibility as a victim, when in fact Plaintiff's complete account identifies her as his primary trafficker.

    d. That Plaintiff participated in the documentary voluntarily without compensation, when Netflix's December 5, 2025 public statement falsely claimed no

participants were paid despite Plaintiff having been compensated via ACH transfer in January 2025.

134. These false statements and impressions constitute defamation per se because they:

    a. Falsely charge Plaintiff with complicity in a criminal scheme by omitting that he was trafficked by Ventura;

    b. Injure Plaintiff in his capacity as a federal witness in the criminal prosecution of Sean Combs by undermining his credibility;

    c. Injure Plaintiff in his capacity as a plaintiff in pending civil litigation against both Combs and Ventura;

    d. Falsely portray the nature of Plaintiff's victimization and trafficking.

135. Netflix's December 5, 2025 public statement falsely claiming no participants were compensated constitutes defamation per se because it:

    a. Falsely characterizes the nature of Plaintiffs relationship with Defendants;

    b. Falsely suggests Plaintiff participated without any contractual consideration;

    c. Was made with actual malice, as Netflix knew Plaintiff had been compensated;

    d. Damages Plaintiffs credibility in his claims that he was fraudulently induced;

    e. Creates a false public record that undermines Plaintiffs legal positions.

136. The false statements were made with actual malice or reckless disregard for the truth because:

    a. Defendants were explicitly told by Plaintiff in his February 27, 2025 email that Cassie Ventura sex trafficked him;

    b. Defendants conducted a 4-6 hour re-interview on March 6, 2025 in which Plaintiff provided extensive testimony about Ventura's role as his primary trafficker;

    c. Defendants deliberately edited out and suppressed Plaintiff's account despite promising they were "definitely not looking to tell a story that is inaccurate";

    d. Defendants knew the omissions and editorial framing would create false impressions about Plaintiff's victimization;

    e. Defendants acted with knowledge of falsity or with reckless disregard for whether their portrayal was true.

137. The defamatory statements have caused severe harm to Plaintiff's reputation, including:

    a. Damage to his credibility as a federal witness;

    b. Damage to his credibility as a plaintiff in civil litigation;

    c. False public perception of the nature of his trafficking victimization;

    d. Humiliation and embarrassment;

    e. Loss of standing in his community.

138. As a direct and proximate result of Defendants' defamation, Plaintiff has suffered and continues to suffer damages.

139. WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory damages, punitive damages, attorneys' fees, costs, and such other relief as the Court deems just and proper.

### THIRD CAUSE OF ACTION

#### (Intentional Infliction of Emotional Distress)

140. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 88 as if fully set forth herein.

141. Under New York law, to recover damages for intentional infliction of emotional distress, a plaintiff must prove: (1) extreme and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and injury; and (4) severe emotional distress. *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993).

142. Defendants' conduct was extreme and outrageous in that they:

    a. Targeted a documented federal sex trafficking victim who was in a vulnerable emotional state;

    b. Made specific promises to tell his story accurately, knowing he was a trafficking victim who had been silenced by other media outlets;

    c. Induced him to participate in a 4-6 hour re-interview where he provided extensive traumatic testimony about being sex trafficked;

    d. Deliberately suppressed his account of being trafficked by Cassie Ventura;

    e. Manipulated his story to protect and grant credibility to his primary trafficker;

    f. Used his trauma and victimization for commercial profit while silencing his voice;

g. Portrayed his primary trafficker as a victim in the same documentary;

h. Did all of this in furtherance of Curtis Jackson's personal vendetta against Sean Combs, using Plaintiff as a pawn.

143. Defendants' conduct goes beyond all possible bounds of decency and is utterly intolerable in a civilized community, particularly given that:

   a. Plaintiff explicitly told Defendants he was "confused" and had no experience with documentary interviews;

   b. Plaintiff is a sex trafficking victim suffering from trauma;

   c. Defendants promised accuracy and then deliberately misrepresented his story;

   d. Defendants silenced a trafficking victim to protect a trafficker;

   e. This conduct violates fundamental public policy protecting trafficking victims.

144. Defendants acted intentionally or with reckless disregard for the substantial probability that their conduct would cause Plaintiff severe emotional distress.

145. Defendants knew or should have known that:

   a. Plaintiff is a documented trafficking victim suffering from trauma;

   b. Misrepresenting his story would cause re-traumatization;

   c. Silencing his account of being trafficked by Ventura would cause severe distress;

   d. Portraying his trafficker as a victim would be devastating to him;

   e. Using his trauma for commercial profit while suppressing his truth would cause severe harm.

146. Defendants' conduct directly and proximately caused Plaintiff to suffer severe emotional distress, including:

   a. Re-traumatization from reliving his trafficking victimization during the interviews;

   b. Public ridicule, harassment and damage to his credibility as producers intentional misrepresented his trauma seeking to add Curtis "50 Cent" Jackson in his war of vengeance against Sean Combs;

   c. Severe distress upon discovering his story was manipulated;

   d. Ongoing psychological harm from being silenced as a trafficking victim;

   e. Humiliation and shame;

   f. Anxiety and depression;

    g.  Loss of trust;

    h.  Need for ongoing psychological treatment and therapy.

147. Plaintiff's emotional distress has been severe and is evidenced by his need for ongoing psychological treatment.

148. WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory damages, punitive damages, attorneys' fees, costs, and such other relief as the Court deems just and proper.

## FOURTH CAUSE OF ACTION

(Breach of Implied Covenant of Good Faith and Fair Dealing)

149. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 96 as if fully set forth herein.

150. Under New York law, all contracts imply a covenant of good faith and fair dealing in the course of performance. *511 W. 232nd Owners Corp. v. Jennifer Realty Co.,* 98 N.Y.2d 144, 153 (2002).

151. The implied covenant is breached when a party acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement. *Dalton v. Educational Testing Service,* 87 N.Y.2d 384, 389 (1995).

152. A party breaches the implied covenant when it exercises contractual rights "malevolently, for its own gain, as part of a purposeful scheme designed to deprive [the other party] of the benefits of their contract." *Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Commerce,* 265 A.D.2d 513, 514 (2d Dep't 1999).

153. The Materials License Agreement executed between Plaintiff and Defendant West Tower Road LLC on July 19, 2024 is a valid and enforceable contract governed by New York law.

154. The Agreement granted Defendants editorial discretion and the right to use materials provided by Plaintiff.

155. The Agreement implicitly promised that Defendants would not exercise their editorial discretion malevolently or as part of a scheme to deprive Plaintiff of the benefit of his bargain.

156. The benefit of Plaintiff's bargain was that his story as a sex trafficking victim would be told in the documentary, and that he would receive fair and accurate treatment as promised by Defendants.

157. Defendants breached the implied covenant of good faith and fair dealing by:

   a. Exercising their editorial discretion malevolently and in bad faith;

   b. Using their editorial discretion as part of a purposeful scheme to silence Plaintiff's account as a trafficking victim;

   c. Making false promises to induce Plaintiff to participate in interviews and continue cooperating;

   d. Deliberately suppressing Plaintiff's testimony that he was trafficked by Cassie Ventura;

   e. Manipulating Plaintiff's story to protect his primary trafficker and to serve Curtis Jackson's personal vendetta;

   f. Depriving Plaintiff of the fundamental benefit of his bargain—having his story told accurately;

   g. Acting in a manner that destroyed Plaintiff's right to receive the fruits of the contract.

158. Defendants' breach was not merely an exercise of contractual discretion but rather a bad faith scheme to exploit a trafficking victim's trauma for commercial gain while silencing his voice to serve Defendants' agenda.

159. This claim is not duplicative of a breach of contract claim because Defendants' conduct involved distinct bad faith actions that go beyond any alleged breach of express contractual provisions.

160. As a direct and proximate result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered damages.

161. WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory damages, punitive damages, attorneys' fees, costs, and such other relief as the Court deems just and proper.

FIFTH CAUSE OF ACTION

(Fraudulent Misrepresentation to the Public / Consumer Fraud)

162. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through as if fully set forth herein.

163. Under New York law, fraudulent misrepresentation requires proof of: ( 1) a misrepresentation or omission of material fact; (2) which was false and known to be false by the defendant; (3) made for the purpose of inducing the other party to rely upon it; ( 4) justifiable reliance of the other party on the misrepresentation; and (5) resulting injury. *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995).

164. Additionally, under New York General Business Law § 349, deceptive acts or practices in the conduct of any business, trade, or commerce are unlawful.

165. On or about December 5, 2025, Netflix, Inc. publicly released a statement representing that no participants in "The Reckoning" were paid or compensated for their interviews or participation in the documentary.

166. This statement was a representation of material fact concerning:

    a. The production practices of Netflix and the documentary's producers;

    b. The nature of participants' relationships with the production;

    c. The ethical standards employed in creating the documentary;

    d. Whether participants were provided consideration that might influence their statements.

167. Netflix's statement was false when made.

168. Netflix knew the statement was false when it was made because:

    a. Netflix possessed records showing Plaintiff had been compensated via ACH transfer in January 2025;

    b. Netflix possessed email records showing Plaintiff had requested payment multiple times over several months;

    c. Netflix was responsible for authorizing or processing payments to participants;

    d. Netflix maintained financial records of production costs including participant compensation;

    e. Netflix had knowledge of the terms of the Materials License Agreement and any compensation provisions.

169. Netflix made this false statement with the intent to:

a. Deceive the public about the production practices employed in creating "The Reckoning";

b. Minimize Netflix's potential liability to participants who claim they were exploited;

c. Defend against mounting public criticism regarding the documentary's treatment of participants;

d. Create the false impression that participants volunteered their stories without financial inducement;

e. Discourage potential claimants from pursuing legal action by suggesting they had no contractual relationship with Netflix;

f. Mislead courts, regulators, and the public about the commercial nature of Netflix's relationship with participants.

170. Netflix's false statement was made publicly and was intended to be relied upon by:

a. Current and potential Netflix subscribers making decisions about whether to support Netflix's content;

b. Members of the public evaluating the credibility and ethics of "The Reckoning";

c. Other documentary participants considering whether to pursue claims;

d. Regulators and oversight bodies;

e. Courts evaluating claims related to the documentary;

f. Media outlets covering the documentary and related controversies.

171. Netflix's false statement has been republished by numerous media outlets, amplifying its reach and impact.

172. Plaintiff has been directly injured by Netflix's false public statement in that:

a. The false statement undermines Plaintiffs claims that he was induced to participate through promises and contractual consideration;

b. The false statement creates a misleading public record that Plaintiff must now correct through costly litigation;

c. The false statement damages Plaintiffs credibility by suggesting he had no financial arrangement with Defendants;

d. The false statement suggests that Plaintiffs participation was purely voluntary, minimizing the coercive and fraudulent

e. inducement that actually occurred;

f. The false statement compounds the reputational harm Plaintiff has already suffered;

g. The false statement creates additional obstacles to Plaintiffs pursuit of justice.

173.Netflix's conduct also constitutes a deceptive practice under New York General Business Law§ 349 in that:

   a. Netflix engaged in consumer-oriented conduct by making public statements about its documentary production practices;

   b. Netflix's statement was materially misleading to reasonable consumers;

   c. Plaintiff and other consumers have been injured by Netflix's deceptive practices;

   d. Netflix's false statement affects consumers' decisions regarding whether to subscribe to Netflix and whether to trust Netflix's content.

174.Netflix's conduct was willful and knowing, demonstrating a pattern of deception designed to exploit participants like Plaintiff while publicly denying such exploitation.

175.As a direct and proximate result of Netflix's fraudulent misrepresentation to the public, Plaintiff has suffered and continues to suffer:

   a. Additional reputational harm;

   b. Damage to the credibility of his legal claims;

   c. The need to expend additional resources correcting the false public record;

   d. Humiliation and emotional distress from being publicly portrayed as an uncompensated volunteer when he was in fact paid;

   e. Interference with his ability to pursue his claims effectively;

   f. Additional economic damages.

176.Netflix's conduct was willful, wanton, and malicious, entitling Plaintiff to punitive damages.

177.WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory damages, treble damages under New York General Business Law § 349, punitive damages, attorneys' fees, costs, and such other relief as the Court deems just and proper.

SIXTH CAUSE OF ACTION

(Unjust Enrichment)

178. Plaintiff repeats and realleges all prior allegations.

179. Plaintiff provided substantial value to Defendants, including:

    a. Unique firsthand testimony as a federal trafficking victim;

    b. Materials, photographs, and documents;

    c. Multiple hours of interview time;

    d. His story, likeness, and personal trauma;

    e. Credibility as a named federal victim;

    f. Content that was central to the documentary's narrative.

180. Defendants were enriched by Plaintiffs contributions through:

    a. Commercial success of "The Reckoning" on Netflix;

    b. Subscriber revenue from the documentary;

    c. Enhanced reputation and publicity;

    d. Use of Plaintiffs story to grant credibility to their narrative.

181. Defendants' enrichment was at Plaintiffs expense because they:

    a. Obtained his story and testimony;

    b. Misrepresented how it would be used;

    c. Used his trauma for commercial gain;

    d. Damaged his reputation in the process.

182. Under principles of equity and good conscience, it would be unjust for Defendants to retain the benefits of Plaintiffs contributions while having misrepresented how his story would be told and having damaged him in the process.

183. Plaintiff is entitled to restitution in an amount to be determined at trial representing the value of his contributions to the documentary

SEVENTH CAUSE OF ACTION

(Declaratory Judgment - CPLR § 3001)

184. Plaintiff repeats and realleges all prior allegations.

185. An actual controversy exists between the parties regarding:

        a. Whether the September 17, 2024 Release bars Plaintiff's claims arising from post-Release fraudulent inducement;

> b. Whether the Release is void as against public policy protecting trafficking victims;
>
> c. Whether the Release is unconscionable;
>
> d. Whether Netflix's December 5, 2025 statement was false;
>
> e. Whether Defendants' editorial decisions constituted bad faith breach of contract.

186. Plaintiff seeks a declaration that:

> a. The Release does not bar claims based on the February 28, 2025 fraudulent inducement of the March 6, 2025 interview;
>
> b. The Release is unenforceable as against public policy;
>
> c. Netflix's December 5, 2025 statement was materially false;
>
> d. Defendants breached the implied covenant of good faith and fair dealing.

187. A declaratory judgment is necessary and appropriate to resolve the parties' legal relationships and to protect Plaintiffs rights as a federal trafficking victim.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants as follows:

1. Awarding compensatory damages in an amount to be determined at trial, but not less than $20,000,000;

2. Awarding punitive damages in an amount to be determined at trial;

   a. Awarding treble damages pursuant to New York General Business Law§ 349;

3. Awarding pre-judgment and post-judgment interest as provided by law;

4. Awarding Plaintiff his reasonable attorneys' fees and costs of this action;

5. Granting such other and further relief as this Court deems just and proper.

### DEMAND FOR PRELIMINARY INJUNCTION

6. Plaintiff respectfully requests the Court enter a preliminary injunction:

   Requiring Netflix to append a content notice to "The Reckoning" acknowledging that participant accounts were edited and may not reflect complete testimony provided;

   Requiring Netflix to correct or retract its December 5, 2025 false public statement regarding participant compensation;

7. Prohibiting Defendants from making further false public statements about Plaintiff's participation or compensation.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable pursuant to CPLR § 4102.

DATED: December 20, 2025, 2025

Respectfully submitted,

*Clayton Howard*

Clayton Howard
Plaintiff Pro Se
24 Orchard Street
Carteret, New Jersey 07008
(929)781-7791
itsclaytonhoward@gmail.com

## VERIFICATION

STATE OF NEW YORK)

) ss.:

COUNTY OF MANHATTAN)

I, CLAYTON HOWARD, being duly sworn, deposes and says:

I am the Plaintiff in the above-captioned action. I have read the foregoing Verified Complaint
and know the contents thereof. The contents are true to my own knowledge, except as to
matters therein stated to be alleged on information and belief, and as to those matters, I believe
them to be true.

Specifically, I verify under penalty of perjury that:

1. I received payment via ACH transfer to my Navy Federal Credit Union account in
   January 2025 for my participation in "The Reckoning";

2. I sent multiple emails to Vanessa Sanchez requesting payment between December 2024
   and January 2025;

3. I possess bank records documenting the ACH transfer;

4. I am aware that Netflix publicly stated on or about December 5, 2025, that no
   participants were compensated;

5. Netflix's statement is false as to my participation.

*Clayton Howard*

CLAYTON HOWARD

## CERTIFICATION PURSUANT TO 28 U.S.C. § 1746

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 13, 2025.

*Clayton Howard*
Clayton Howard

## EXHIBIT LIST

Exhibit A: Materials License Agreement dated July 19, 2024

Exhibit B: Email correspondence between Clayton Howard and Vanessa Sanchez dated
February 27-28, 2025

Exhibit C: Email correspondence between Clayton Howard and Vanessa Sanchez regarding
payment requests

(December 2024 - January 2025)

Exhibit D: Navy Federal Credit Union bank records showing ACH transfer received in January
2025

Exhibit E: Media articles republishing Netflix's false statement regarding participant
compensation

Exhibit F: Media appearance of documentary participants from December 2023 until airing of
"The Reckoning".

Exhibit G: Clayton Howard v. Sean Combs, et al - civil action against both Sean Combs and
Casandra Ventura in the United States District Court for the Central District of California, Case
No. CV25-06031(AH), filed June 29, 2025, arising from the sex trafficking scheme.

## SUPPORTING CASE LAW SUMMARY

### Fraudulent Inducement

*Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 421 (1996) - Establishes the four elements required to prove fraudulent inducement under New York law: (1) misrepresentation or material omission of fact which was false and known to be false by defendant; (2) made for the purpose of inducing reliance; (3) justifiable reliance; and (4) injury.

*Channel Master Corp. v. Aluminium Ltd. Sales, Inc.,* 4 N.Y.2d 403 (1958) - A party claiming fraudulent inducement must show that the misrepresentation was collateral to the contract and induced the party to enter into the agreement.

### Defamation Per Se

*Dillon v. City of New York,* 261 A.D.2d 34, 38 (1st Dep't 1999) - Establishes the elements of defamation: (1) false statement published to third party; (2) made with applicable fault level; (3) defamatory statement; and (4) harm to reputation.

*Liberman v. Gelstein,* 80 N.Y.2d 429 (1992) - Statements are defamatory per se when they charge a person with a serious crime or tend to injure a person in their trade, business, or profession.

*Gross v. New York Times Co.,* 82 N.Y.2d 146 (1993) - Defamation claims involving matters of public concern require showing of actual malice, defined as knowledge of falsity or reckless disregard for truth.

### Intentional Infliction of Emotional Distress

*Howell v. New York Post Co.,* 81 N.Y.2d 115, 121 (1993) - Establishes four elements for IIED: (1) extreme and outrageous conduct; (2) intent to cause or disregard of substantial probability of causing severe emotional distress; (3) causal connection; and (4) severe emotional distress.

*Murphy v. American Home Products Corp.,* 58 N.Y.2d 293 (1983) - Conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

### Implied Covenant of Good Faith and Fair Dealing

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.,* 98 N.Y.2d 144, 153 (2002) - All contracts imply a covenant of good faith and fair dealing in performance.

*Dalton v. Educational Testing Service,* 87 N.Y.2d 384, 389 (1995) - Implied covenant is breached when a party acts in a manner that would deprive the other party of the right to receive benefits under their agreement.

*Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Commerce,* 265 A.D.2d 513, 514 (2d Dep't 1999) - Breach occurs when contractual rights are exercised "malevolently, for its own gain, as part of a purposeful scheme designed to deprive [the other party] of the benefits of their contract."

## Federal Trafficking Victim Protections

18 U.S.C. § 1591 - Federal sex trafficking statute defining commercial sex acts induced by force, fraud, or coercion as human trafficking.

Trafficking Victims Protection Act of 2000 (TVPA), Pub. L. No. 106-386, 114 Stat. 1464 - Landmark federal legislation establishing protections for trafficking victims and creating framework for victim restitution and support.

## Fraudulent Misrepresentation / Consumer Fraud

*Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 153 (2d Cir. 1995)

- Establishes elements of fraudulent misrepresentation under New York law: misrepresentation of material fact, known to be false, made to induce reliance, justifiable reliance, and injury. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank,* 85 N.Y.2d 20, 26 (1995)- Fraudulent misrepresentation requires showing that defendant made a false representation with knowledge of its falsity and with intent to deceive.

New York General Business Law§ 349 - Prohibits deceptive acts or practices in the conduct of any business, trade, or commerce. Provides for treble damages and attorneys' fees.

*Stutman v. Chemical Bank,* 95 N.Y.2d 24, 29 (2000) -To prevail under GBL § 349, plaintiff must show: (1) defendant's act or practice was consumer-oriented; (2) it was misleading in a material way; and (3) plaintiff was injured as a result.

*Maurizio v. Goldsmith,* 230 F.3d 518,521 (2d Cir. 2000) - Public statements by corporations regarding their business practices can constitute consumer-oriented conduct under GBL § 349. *Karlin v. IVF America, Inc., 93 N.Y.2d 282,290 (1999)* - GBL § 349 protects consumers against deceptive business practices and broadly applies to virtually all economic activity.

## Post-Release Fraud

*Corsello v. Verizon N.Y., Inc.,* 18 N.Y.3d 777, 785 (2012): Release does not bar claims based on fraudulent inducement of acts occurring after the release was signed.

*Mangini v. McClurg,* 24 N.Y.2d 556, 563 (1969): Release obtained through fraud may be set aside; subsequent fraudulent conduct is not covered by prior release.

*Sheth v. New York Life Ins. Co.,* 273 A.D.2d 72, 73 (1st Dep't 2000): Where plaintiff signed release but was subsequently induced by new fraudulent representations to take additional actions, the release did not bar claims based on subsequent fraud.

*Simkin v. United States,* 715 F. Supp. 2d 342, 350 (S.D.N.Y. 2010): A general release does not preclude claims based on fraudulent conduct occurring after the release was executed.

*Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 322 (1959): While a release may bar claims existing at the time of execution, it does not relieve a party from liability for subsequent fraudulent conduct.

## Promissory Fraud

*Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986): Fraud may lie in a promise of performance made with a present intention not to perform.

*Channel Master Corp. v. Aluminium Ltd. Sales,* 4 N.Y.2d 403, 407 (1958): Promise made with present intent not to perform constitutes fraud.

*Cohn v. Lionel Corp.*, 21 N.Y.2d 559, 565 (1968): A representation as to a state of mind is as much a representation of fact as a statement with reference to any other subject.

*Scholastic Inc. v. Harris*, 259 F.3d 73, 87 (2d Cir. 2001): Specific promise regarding performance can constitute actionable fraud even if pertaining to future conduct when made without intent to perform.

## Integration Clause / Fraud in the Inducement

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996): New York law is clear that a party may not avoid liability for fraud in inducing a contract simply by including a disclaimer of reliance in the contract; integration clauses do not bar fraud in the inducement claims.

*JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 406 (S.D.N.Y. 2004): Under New York law, merger clauses do not prevent a party from introducing parol evidence to establish fraud in the inducement.

## Public Policy

*Weaver v. Bank of America*, 303 F. Supp. 2d 453, 463 (S.D.N.Y. 2004): Contracts that violate public policy are unenforceable.

*Denburg v. Parker Chapin Flattau & Klimpl*, 82 N.Y.2d 375, 380 (1993): Contracts or releases that contravene strong public policy are unenforceable regardless of the parties' intentions.
*In re Agent Orange Product Liability Litigation*, 597 F. Supp. 740, 845 (E.D.N.Y. 1984), aff'd, 818 F.2d 145 (2d Cir. 1987): Courts will not enforce contractual provisions, including releases, that contravene public policy, particularly where vulnerable populations are involved.
*United States v. Singleton*, 144 F.3d 1343, 1360 (10th Cir. 1998) (en banc): Strong public policy protects the integrity of federal witnesses.

*Sarlo v. J&L Metal Prod.*, 178 A.D.2d 879 (3d Dep't 1991): Release unenforceable where it violates public policy.

### Unconscionability

*Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1, 10-11 (1988): Unconscionability requires showing procedural and substantive components; contract may be unenforceable if 'gross' on one measure even if less so on the other.

*State of New York v. Avco Fin. Servs.*, 50 N.Y.2d 383, 390 (1980): Procedural unconscionability focuses on whether one party lacked meaningful choice; unconscionability found where sophisticated lender imposed terms on unsophisticated consumer.

*United States v. Todd*, 627 F.3d 329, 334 (9th Cir. 2010): Trafficking victims have diminished decision-making capacity due to trauma, coercion, and psychological manipulation.
*United States v. Jungers*, 702 F.3d 1066, 1072-73 (8th Cir. 2013): Same - recognizing trafficking victims' vulnerabilities affecting decision-making.

### Defamation - Misleading Context

*Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 379-80 (1977): A communication which does not contain any false statement may still be defamatory if it is misleading or creates a false impression.

*Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 178 (2d Cir. 2000): Selective quotation creating misleading impression can be defamatory even if individual quotes are accurate.

Equitable Estoppel

*Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001): Elements of equitable estoppel under New York law.

### Fraud in the Factum

*Wainwright v. Federal Nat'l Bank*, 147 A.D.2d 77, 81 (1st Dep't 1989): Fraud in the factum, unlike fraud in inducement, renders contract void ab initio when party is deceived about the very nature or character of the document being signed.

### Exclusivity / Contract Breach Defense

*Fesseha v. TD Waterhouse Investor Servs., Inc.*, 761 N.Y.S.2d 22, 23 (1st Dep't 2003): Breach of contract by one party does not excuse the other party's fraudulent conduct.

*Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1193 (2d Cir. 1996): Ambiguous contractual provisions are construed against the drafter.

*Mahoney v. Adirondack Publ'g Co.*, 71 N.Y.2d 31, 39 (1987): Privilege protects statements made to protect one's reputation.

### Consumer Fraud

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 26 (1995): Test for whether a statement is misleading is how a reasonable consumer would understand it.

# EXHIBIT A

MAterial Release

## MATERIALS LICENSE AGREEMENT

This License Agreement (the "**License**") dated as of July 19, 2024 is hereby entered into by and between Clayton Howard ("**Owner**") and West Tower Road LLC ("**Producer**"). Producer is producing a documentary audiovisual project currently entitled "Untitled DD Project" (including all versions thereof and all subsidiary and ancillary productions based thereon including, without limitation, audio-only and audio-visual productions, collectively referred to herein as the "**Project**").

1.        License. For good and valuable consideration, the receipt and adequacy of which Owner hereby acknowledges, Owner hereby expressly grants to Producer, its successors, assigns, agents and licensees the irrevocable right and license to use any and all memorabilia and/or other materials (including without limitation, photographs, videos, writings and other materials) (the "**Material(s)**") provided by Owner for use in and in connection with the Project, and in all advertising, marketing and publicity therefor (including, without limitation, institutional advertising), and to exploit the Material(s) as incorporated in the Project and all footage, stills, and other materials shot during production of the Project, throughout the universe, in perpetuity, in all formats and media, whether now existing or hereafter devised. Owner acknowledges and agrees that Producer may alter, edit, or obscure the Material(s), that all creative decisions regarding the use of the Material(s) shall be at the sole discretion of Producer, and that Owner has no right of approval in connection with the use of the Material(s) as contemplated herein. Owner hereby expressly waives any rights of droit moral that may be afforded to Owner under the laws of any country in any capacity connected with the Material(s) or its use in the Project. Producer shall have no obligation to use the Material(s) or any of the rights granted herein or to release or otherwise exploit the Project. For the avoidance of doubt, as between Owner and Producer, Producer shall own the copyright in the Project and in all advertising and publicity therefor.

2.        License Fee. In full consideration for all rights granted to Producer, Producer shall pay to Owner a license fee in the amount of Two Thousand Dollars (USD$2,000), which shall be payable as follows: (i) Five Hundred Dollars (USD$500) within two (2) weeks of Owner's execution of this License; (ii) Five Hundred Dollars (USD$500) upon Owner's provision of and Producer's selection of the Material(s) to use in the Project; and (iii) One Thousand Dollars (USD$1,000) upon the initial commercial release of the Project.

3.        Exclusivity. Owner agrees that Owner will not participate in, or cooperate with any third party developing or producing, any documentary production about or concerning the same or similar subject matter as the Project during the period commencing on the date hereof and ending one (1) year from the initial commercial release of the Project (the "**Exclusivity Period**"). For the sake of clarity, during the Exclusivity Period, Owner will not cooperate (whether by participating in recorded interviews, providing materials (including, without limitation, the Materials) within Owner's possession or control, or otherwise) with any third party producing a documentary production concerning the same subject matter as the Project, or substantially similar thereto.

4.        Representation and Warranties. Owner hereby represents, warrants and agrees that: (i) Owner holds all right, title and interest (including without limitation, all copyrights) in and to the Material(s); (ii) Owner has the full right and authority to enter into this License and to grant the rights granted hereunder; and (iii) it is not necessary for Owner to obtain the consent or permission of or pay any amounts (including royalties or residuals) to any third party in order to fully enjoy and exercise the rights granted to Owner hereunder. Owner will indemnify and hold harmless Producer, its successors and assigns from any and all claims, suits, losses, costs, expenses (including reasonable counsel fees), damages or recoveries which may be obtained against, imposed upon or suffered by Producer, its employees, associates, successors, designees, licensees and assigns by reason of Owner's breach of any of the representations, warranties or agreements contained herein.

5.        Release. Owner agrees that it will not claim or assert that any portrayal, depiction, exploitation, alteration, blurring, distortion or illusionary effect of or with respect to the Material(s) constitutes a violation of any of its rights and Owner shall release Producer, its successors, and assigns from all claims arising out of or in connection with any portrayal, depiction, exploitation, alteration, blurring, distortion or illusionary effect of or with respect to the Material(s) pursuant to this License.

6.        Rights as Member of the Public. Producer's rights as a member of the public shall not be limited by this License, and Producer may exercise such rights as though this License were not in existence.

7.        Publicity/Confidentiality. Owner will not, without Producer's prior written approval, (i) issue or authorize the publication of any news story, publicity or publicity materials relating to the Project, (ii) make any derogatory or knowingly false statements concerning the Project, Producer or any officers or employees of Producer, (iii) disclose any information regarding the Project (including, without limitation, the production plan, the budget, the terms of any contracts (including,

without limitation, this License), the release plan, etc.), or (iv) encourage any other individual to do any of the foregoing. Owner acknowledges and agrees that all promotional activity in connection with the Project must be approved in advance in writing by Producer and that Owner may not release to third parties any materials relating to the Project without prior written permission from Producer.

8.    Remedies.    **Owner's rights and remedies in the event of any breach or alleged breach of this License by Producer** will be limited to the right, if any, to recover money damages in an action at law, and in no event will Owner be entitled by reason of any such breach or alleged breach to terminate this License or to seek any equitable remedy, including, without limitation, injunctive relief or any other equitable remedy which would enjoin, restrain or otherwise hinder the production, distribution, exhibition, advertising or any other means of exploitation of the Project or any subsidiary or ancillary rights in connection therewith.

9.    Assignment.    Producer shall have the right to transfer or assign its rights and/or obligations pursuant to this License to any other person, corporation or entity and shall be relieved of its obligations to Owner hereunder to the extent that such obligations are assumed by such person, corporation or entity. Owner may not assign this License or any rights hereunder, **in whole or in part, without Producer's prior written approval, and any such purported assignment shall be null and void.**

10.    Miscellaneous.    **THE PARTIES AGREE THAT THIS LICENSE SHALL BE ON A NON-PRECEDENTIAL AND "NO QUOTE" BASIS, AS SUCH TERMS ARE CUSTOMARILY UNDERSTOOD IN THE MOTION PICTURE INDUSTRY.** Producer shall have the right to transfer or assign its rights and/or obligations pursuant to this License to any other person, corporation or entity. This License shall be construed in accordance with the laws of the State of New York applicable to agreements which are executed and fully performed within the State of New York, exclusive of conflicts of laws principles. The invalidity, illegality or unenforceability of any provision or clause contained in this License will not affect the legality or enforceability of the remainder of the provisions of this License. This License constitutes the entire agreement between the parties hereto and supersedes all prior agreements, representations and warranties, both oral and written, if any, made with respect to the subject matter hereof. This License may be amended only by written agreement executed by both of the parties hereto.

This License, dated as of the date first set forth above, shall be effective upon the signature of authorized representatives of Owner and Producer.

OWNER

DocuSigned by:

A301893D39A0488
Clayton Howard

Date:  **september 17, 2024**

**WEST TOWER ROAD LLC**

Signed by:
By:    Alex Stapleton
Its Authorized Signatory

# Exhibit B

**Vanessa S Reinterview - Casandra**

 Gmail                                                    **Clayton Howard** ▓▓▓▓▓▓▓▓▓▓▓▓          ▶

---

## Cassandra

11 messages

**Clayton Howard** ▓▓▓▓                                    ▶          Thu, Feb 27, 2025 at 7:35 PM
To: Vanessa Sanchez ◁ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Vanessa

Hey I have done a lot of thinking and I'm still super disappointed in my interview with you guys. Now after interviewing with prosecutors I feel more and more that there are things about my relationship with Cassandra that need to be told if your guys intend on providing something different than all the rest of the content coming out.

There are no accounts like mine so far out that I have seen. I was in that room with these two people, just me, him and her for over seven (7) years and a lot of the things Cassandra has claimed are not true. I saw her physically abused yes, there was verbal abuse yes, there was massive drug use yes. But things were different and not as she told and I know the truth. And this truth I have stated to prosecutors from the very beginning. I am not saying Puff is innocent, I'm saying that Cassandra was a co conspirator who sex trafficked me. By definition I was paid to fly from NYC to LA and NYC to MIAMI for years, and I was paid to be with her only. No Puff, just Cassie- only ever Cassie!

Due to our agreement Im am contractually bound to silence but once it is over I intend to find a way to tell the true story of the relationship between Cassie and myself. She was not forced at all. The abuse was due to other factors that were in no way related to her being unwilling to engage in sexual activities as she initiated it despite him controlling it while it went on. Tyrone had Rolling Stone interview me; I am "Mr Nathan". But the reporter left out everything I told about Cassandra and actually attributed many things to Puff instead which I found crazy. But I cannot speak out as I am a witness, so I have not as the objective is justice for all his true victims.

I have never been interviewed like you guys did prior to our meeting so I was confused and didn't know what I was allowed to say. Because of that I didn't talk about a lot because again I was given no real guidance with all due respect just allowed to kinda freestyle. That may be good but not always with someone with no experience.

Even if we could set up a zoom I would like to further expand on my encounter. I feel there are things that should be said if a true account of events is to be given, and maybe the things I have to say might be things you guys have not heard thus far. I have situations and can provide times dates and verification these things happened. No video but airline receipts. I even have a story about when I got Cassie pregnant I didn't tell you and I really want to. I ask that my request be considered.

Respectfully Submitted

Clayton
▓▓▓▓▓▓

---

**Vanessa Sanchez** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓         —          Fri, Feb 28, 2025 at 3:03 PM
To: Clayton Howard ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

HI Clayton,

Thanks for reaching out. I'm sorry that you've had these feelings about your interview. I understand how a first interview can be very nerve wracking.

We are definitely not looking to tell a story that is inaccurate and understand your reasoning in wanting to reach out. It takes a lot to come forward and speak your truth when it goes against the narrative that everyone is telling.

You have good timing. We are filming again in NYC next week. Are you available next Thursday, 3/6? I've spoken to Alex and relayed how you are feeling and she would love to add you to our schedule.

I'm free for the rest of the evening if you want to hop on the phone to discuss. Let me know!

Vanessa
[Quoted text hidden]

---

12/3/25, 12:49 PM    Gmail - Cassandra

**Clayton Howard**    Fri, Feb 28, 2025 at 4:51 PM
To: Vanessa Sanchez

Vanessa

I am suppose to testify at thursaday between 1-3 pm about this very case again as Im being called to the grand jury. Anytime after that could work for me but i understand it will be late in the day.

We can speak if you like and you wish to know some of what i intend to say. Im picking up my toddler for the weekend and should be home about 7, i don't know if thats too late but we can speak if you want.

Clayton

Sent from my mobile device, please excuse brevity and/or spelling mistakes.
[Quoted text hidden]

**Clayton Howard**    Sat, Mar 1, 2025 at 1:31 PM
To: Vanessa Sanchez

Vanessa

Sorry I would have like to speak but i got in late with me toddler. I want to tell the un filter truth. As i said, in the beginning I was sure how it would work and when Alex and I spoke I was trying to tell her more about Cassie.

I have alot to day that needs to be heard. Cassie is not a victim of sex trafficing shes a victim of domestic violence and willingly participate in the sexual enteractions, at least with me. I impregnated her, sleep with her unprotected for 5-6 years, she drug me, made me stand naked and play with myself will she masterbated and much more. I know for a fact she was not forced and I was to tell my story as I feel the media has lied to destory Puff. Hes guilty dont get me wrong because be was involved, but Cassie was too and shes not a victim, shes a co conspirator.

I want to give this to you guys instead of TMZ or someone else. Also, our agreement locks me from speaking out until you air. So i want to tell you and I hope you guys are true to the game and tell the whole story

Let me know about availability Thursday Im back before the Grand Jury so unless its in the am i cant, and I have A-lot to say i guys might want some tome for me 2-3 hrs at least . Please be sure the place os warm and you have water as there is a lot i intend to tell you

Clayton H
Sent from my mobile device, please excuse brevity and/or spelling mistakes.
[Quoted text hidden]

**Vanessa Sanchez**    Sun, Mar 2, 2025 at 4:36 PM
To: Clayton Howard

Hi Clayton,

Can we talk tomorrow? Sorry, I've had family visiting this weekend and haven't been able to get away to give you a call.

We can also accommodate you on Thursday morning. I'll have more details for you tomorrow. Let me know when you can hop on the phone real quick.
[Quoted text hidden]

**Clayton Howard**    Sun, Mar 2, 2025 at 5:06 PM
To: Vanessa Sanchez

Vanessa

Hey no worries I was on daddy duty anyway so its fine and yes we can. I work from home tomorrow so i should be free

12/3/25, 12:49 PM                                              Gmail - Cassandra

Clayton

Sent from my mobile device, please excuse brevity and/or spelling mistakes.

[Quoted text hidden]

---

**Vanessa Sanchez**                                                              Mon, Mar 3, 2025 at 1:34 PM
To: Clayton Howard

Let me know what time you can talk today. I'm available whenever.
[Quoted text hidden]

---

**Clayton Howard**                                                               Mon, Mar 3, 2025 at 1:36 PM
To: Vanessa Sanchez

Vanessa

I'll be free at 2pm if that works for you

Clayton H
[Quoted text hidden]

---

**Vanessa Sanchez**                                                              Mon, Mar 3, 2025 at 1:41 PM
To: Clayton Howard

ok.. perfect. I will call you then.
[Quoted text hidden]

---

**Vanessa Sanchez**                                                              Mon, Mar 3, 2025 at 7:42 PM
To: Clayton Howard

Hey!

Can you send me your pickup address for Wednesday morning? I'll send you the pick up time tomorrow.
[Quoted text hidden]

---

**Clayton Howard**                                                               Mon, Mar 3, 2025 at 8:06 PM
To: Vanessa Sanchez

Vanessa

Clayton H

Sent from my mobile device, please excuse brevity and/or spelling mistakes.

[Quoted text hidden]

# Exhibit C

**Payment from House of non fiction - The Reckoning**



**NAVY FEDERAL**
**Credit Union**
PO Box 3000 • Merrifield, VA • 22119-3000
navyfederal.org

**Statement of Account**
For CLAYTON HOWARD

Statement Period
01/10/25 - 02/09/25

## Checking

**e-Checking -**

Joint Owner(s): NONE

| Date | Transaction Detail | Amount($) | Balance($) |
|------|-------------------|-----------|------------|



| | | 0.02 | |
| 01-16 | Deposit - ACH Paid From West Tower Road E46 01Afd6 | 2,000.00 | 1,963.07 |

### CHANGE OF ADDRESS
PLEASE PRINT. USE BLUE OR BLACK BALL POINT PEN.

| RANK/RATE | NAME (FIRST | MI | LAST) | ACCOUNT NUMBERS AFFECTED |
|-----------|-------------|-----|-------|--------------------------|
| ADDRESS (NO. STREET) | | | | |
| CITY | | STATE | ZIP CODE | |
| SIGNATURE OF NAVY FEDERAL MEMBER | | | | |
| EFFECTIVE DATE (MO., DAY, YR.) | | HOME TELEPHONE NUMBER | | DAYTIME TELEPHONE NUMBER |

# Exhibit D





**12:00** 🔋 74

**Cassie in serious trouble, I went to Diddy's fri...**

@muradmerali434  30,074 views  20h  ...more



👤 Join  🔔∨  👍 1.9K  👎  ↪  ✦

## Comments 446  •

" Cassie was forced he was paid



Ⓦ  **VW Deal Days | Gingerbread Dealership**    ⋮

Sign Then Drive deals so good you'll think the numbers guy is on vacation (he is).

**Sponsored** · Volkswagen



**12:01**

Includes paid promotion >

**Cassie Reportedly "Unreachable" in Freak-Off Lawsuit — Judge Approves Case Moves Forward!**
3:09 / 4:28:30 vice as

## EP641 CASSIE IN MAJOR TROUBLE / JUDGE...

 @trentoutloud  5,534 views  16h ago    ...more

 Join   ⌄  △ 297   ⇗  ✦  ⌐

### Comments 83  •

 Good evening everyone in the Chat. Hope your day was a blessed one 😌 peace, love, and ha...



 **USO is with service members**  ⋮
**when they are deployed to prote...**
We're with service members whenever they miss home most.

**Sponsored · USO**



**12:04**    ull 5G 74



‹ 3  **Trina Savage**

@katrina.vivians

You're not friends on Facebook

**View profile**

5:10 AM

Lame ass nigga. How are you a victim when u was willingly flying your ass out there to fuck. Shut your clout chasing ass up! FIRST OFF, if You KNEW CASSIE Was sleeping with all these men where the proof of that being your baby ???? Nigga bye, u was getting paid well & you fell in love stfu! Ugly ass. You're not a victim of shit. You are an escort that got paid. And u took the drugs willingly 🖕

You can now message and call each other and see

**You've blocked Trina**
You can't message or call them in this chat, and you won't receive their messages or calls.

**Unblock**

**Report**

# Exhibit E

Payment Conversation Howard and Sanchez



**M** Gmail

**Clayton Howard**

---

## None payment
2 messages

---

**Clayton Howard**                                                          Sat, Dec 28, 2024 at 3:35 PM
To: Vanessa Sanchez

Vanessa

As per my agreement with Netflix or your company i believe I am to do no other it reviews. However this is based on payment which i have not recieved and therefore i am about to take an interview offered. Contractual agreements are dependent on the completion of terms which have not been meet on my end.

I ask so there are no issues this be handled immediately

Respectfully

Clayton Howard

Sent from my mobile device, please excuse brevity and/or spelling mistakes.

---

**Vanessa Sanchez**                                                          Sat, Dec 28, 2024 at 4:06 PM
To: Clayton Howard

Hi Clayton,

I am so sorry- we got word back from accounting that we couldn't process your payment because the account numbers on your w9 and ACH form are different.

I'm super sorry about the delay - we have been shut down for the holidays. Are you able to send me both forms that match? We can either pay your company or you as an individual.

Again, super sorry, things got lost in the shuffle because of the end of the year.

Feel free to give me a call if that's easier - 845.464.1966.
Vanessa

>
> On Dec 28, 2024, at 3:36 PM, Clayton Howard <                    wrote:
>
>
[Quoted text hidden]

12/10/25, 11:54 AM

Gmail - ACH



## M Gmail

**Clayton Howard**

---

## ACH
14 messages

**Clayton Howard**
To: Vanessa Sanchez

Sun, Dec 29, 2024 at 6:55 PM

Vanessa

Attached is the Ach info. I am currently out of the country but i would like to confirm this all was handled if possible so I would appreciate an update when you have one

I will be sending the w-9 next

Thank you
Happy Holidays

Clayton h

---

📄 **Netflix ACH.pdf**
4309K

---

**Vanessa Sanchez**
To: Clayton Howard

Mon, Dec 30, 2024 at 8:39 AM

Hey! Thanks for resending. I will pass this along to our accounting and let you know if everything is good.

Thanks so much for your patience and very, very sorry again for the delay.

>
> On Dec 29, 2024, at 6:55 PM, Clayton Howard <i                      wrote:
>
>
[Quoted text hidden]
> <Netflix ACH.pdf>

---

**Vanessa Sanchez**
To: Clayton Howard

Mon, Dec 30, 2024 at 8:39 AM

[Quoted text hidden]

---

**Clayton Howard**
To:

Mon, Dec 30, 2024 at 9:52 AM

Vanessa

Thank you hopefully this time it works as i gave a personal acct and not business

Clayton H

Sent from my mobile device, please excuse brevity and/or spelling mistakes.
[Quoted text hidden]

---

**Vanessa Sanchez**

Mon, Jan 6, 2025 at 9:16 AM

12/10/25, 11:54 AM                                                    Gmail - ACH

To: Clayton Howard

Hi Clayton,

Happy New Year! Just wanted to let you know that your payment will be processed this week so it should hit your account by the end of this week.

I'll circle back if I hear anything else - thank you again for your patience and understanding!
[Quoted text hidden]

---

**Clayton Howard**                                                    Fri, Jan 10, 2025 at 11:47 AM
To: Vanessa Sanchez

Hey Vanessa

Happy New Year

I was abroad the past few weeks and have just returned. I have not received a deposit as of yet but whom would the payer be so i can double check?

Clayton

Sent from my mobile device, please excuse brevity and/or spelling mistakes.
[Quoted text hidden]

---

**Vanessa Sanchez**                                                    Fri, Jan 10, 2025 at 3:57 PM
To: Clayton Howard

Hey Clayton,

I was just trying to get answers from our accounting department but they are all in LA and were evacuated because of the fires. We've had several delays this week on other things because of the fires out there so I'm assuming your check is a part of that.

We were supposed to be back online today but I believe they are still not able to reach the office/homes. I'm super sorry for the delay, it's just a bit of a delicate dance right now with everything that happened. I will circle back with more information ASAP.

Thank you for your patience!

On Jan 10, 2025, at 11:48 AM, Clayton Howard                          wrote:

[Quoted text hidden]

---

**Clayton Howard**                                                    Fri, Jan 10, 2025 at 6:27 PM
To: Vanessa Sanchez

Vanessa

Ok thanks that means they haven't. I did see a strange payment but i had to check because it was more than i thought it would be. I know what that was now so ill wait to here from you

Clayton

Sent from my mobile device, please excuse brevity and/or spelling mistakes.

[Quoted text hidden]

---

12/10/25, 11:54 AM                                                    Gmail - ACH

**Vanessa Sanchez**                                                   Wed, Jan 15, 2025 at 9:56 AM
To: Clayton Howard

Good morning!

We are back on track with everything so you should be getting your payment this week. I believe Friday is the latest it would hit your account but our accounting team has released the funds to your bank.

Thanks again for your patience!
[Quoted text hidden]

---

**Clayton Howard**                                                    Wed, Jan 15, 2025 at 10:36 AM
To: Vanessa Sanchez

Good morning

    Thanks for the update. I will keep and eye on it who is the payer so i may be on lookout a usually get a few deposits on friday

Clayton H

Sent from my mobile device, please excuse brevity and/or spelling mistakes.

[Quoted text hidden]

---

**Vanessa Sanchez**                                                   Thu, Jan 16, 2025 at 12:24 PM
To: Clayton Howard

Hey! The check will be from West Tower Road.

        On Jan 15, 2025, at 10:36 AM, Clayton Howard <                      wrote:

        [Quoted text hidden]

---

**Vanessa Sanchez**                                                   Tue, Jan 21, 2025 at 1:47 PM
To: Clayton Howard

Hi Clayton - just checking in to make sure you got your check?
[Quoted text hidden]

---

**Clayton Howard**                                                    Tue, Jan 21, 2025 at 2:06 PM
To: Vanessa Sanchez

Vanessa

It's pending in my account so I will say yes. Its a military acct so there some extra verification but I see the incoming .
Thanks again for your help

Clayton

Sent from my mobile device, please excuse brevity and/or spelling mistakes.

[Quoted text hidden]

---

**Vanessa Sanchez** ▊                                                      Tue, Jan 21, 2025 at 2:08 PM
To: Clayton Howard ▊

Awesome, thanks for the update and your patience.
[Quoted text hidden]

# Exhibit F

Timeline of Netflix Public Statement

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK

CLAYTON HOWARD,

        Plaintiff,

-against-

NETFLIX, INC.; CURTIS JACKSON;

ALEXANDRIA STAPLETON; G-UNIT FILMS

AND TELEVISION INC.; HOUSE OF

NONFICTION INC.; WEST TOWER ROAD LLC,

        Defendants.

## APPENDIX – CHRONOLOGY OF NETFLIX PUBLIC DENIALS

### REGARDING PAYMENT TO PARTICIPANTS IN "THE RECKONING"

1. December 1, 2025 – Cease-and-Desist from Combs Team Combs' counsel accuses Netflix of paying interviewees and using stolen footage.

2. December 2–3, 2025 – Netflix Formal Public Denials

Netflix publicly states: "No one was paid to participate."

Reported by Variety, Complex, TheWrap, Washington Post, NME, Newsmax.

3. December 3, 2025 – Additional Clarifications

Netflix adds that Curtis Jackson lacked creative control and that all footage was legally obtained.

4. Early December 2025 – Repetition Across Media

Multiple outlets continue quoting Netflix's statement: "No one was paid to participate."

CERTIFICATION PURSUANT TO 28 U.S.C. § 1746

I, Clayton Howard, certify under penalty of perjury that the foregoing Appendix accurately summarizes public statements made by Netflix and related parties as reported in the media. Executed on this 9 day of December, 2025.

*Clayton Howard*

Clayton Howard

# Exhibit G