Clayton Howard

24 Orchard Street

Carteret, New Jersey 07008

(929)781-7791

itsclaytonhoward@gmail.com

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

CLAYTON HOWARD,                                            Civil Action No. 1:26-cv-00707 (DEH)(SN)
    *Plaintiff,*

v.

NETFLIX, INC.;                                                          DECLARATION OF PLAINTIFF
CURTIS JACKSON a/k/a "50 CENT";                  CLAYTON HOWARD IN SUPPORT
ALEXANDRIA STAPLETON;                                 OF PLAINTIFF'S OPPOSITION TO
G-UNIT FILMS AND TELEVISION INC.;            DEFENDANTS' MOTION TO
HOUSE OF NONFICTION INC.; and                   DISMISS
WEST TOWER ROAD LLC,
    *Defendants.*

I, Clayton Howard, Plaintiff in the above-captioned action, declare as follows pursuant to 28 U.S.C. § 1746:

PART I — BACKGROUND AND FEDERAL STATUS

1.  I am the Plaintiff in this action and submit this Declaration in support of my Opposition to Defendants' Motion to Dismiss the First Amended Complaint. I have personal knowledge of all facts stated herein and, if called as a witness, I could and would testify competently thereto.

2.  I am formally identified as Victim #2 in Count 3 of the Indictment in United States v. Sean Combs, Case No. 24-cr-542(AS) (S.D.N.Y.). I cooperated with the Office of the United States Attorney for the Southern District of New York for approximately eighteen

months in connection with that prosecution. My cooperation was extensive, detailed, and conducted at substantial personal and professional risk.

3. Between approximately 2009 and 2019, I was a victim of sex trafficking perpetrated primarily by Cassandra "Cassie" Ventura. During this period, I was paid to fly from New York City to Los Angeles, California, and Miami, Florida, for the sole purpose of engaging in sexual activity with Ms. Ventura. I was not paid to engage in sexual activity with Sean Combs. I had no sexual contact with Sean Combs. The false public impression that I had been sexually assaulted by Combs or had engaged in homosexual activity with him is factually incorrect and deeply damaging to my reputation, my dignity, and my pending federal civil litigation.

4. I am also the plaintiff in *Howard v. Combs et al.*, CV25-06031(AH) (C.D. Cal.), in which Cassandra Ventura is a named defendant. That litigation is directly and materially affected by the false narrative Defendants distributed to 51 million viewers in the Documentary at issue in this case.

PART II — INITIAL CONTACT THROUGH FORMER COUNSEL TYRONE BLACKBURN

5. In or about May 2022, I was approached by my then-counsel, Tyrone A. Blackburn, Esq. ("Blackburn"), regarding an opportunity to participate in a documentary to be produced by Defendant Alexandria Stapleton and distributed by Defendant Netflix, Inc. The documentary concerned Sean Combs, who was at that time under investigation for sex trafficking and related allegations.

6. Blackburn advised me that participating in the documentary was in my interest. He assured me that my participation was safe, that my rights and interests were protected, and that I should proceed with candor. Based upon Blackburn's representations and my trust in him as my legal counsel, I agreed to participate.

7. I relied entirely on Blackburn's guidance throughout my initial engagement with Defendants, including at the time I was asked to execute the Appearance Release dated September 17, 2024. Blackburn did not meaningfully explain the terms of the Release to me, did not advise me of my rights thereunder, did not discuss the scope of the waiver

provisions, and did not negotiate any protections on my behalf. He instructed me to sign and represented to me that I was protected. I was not yet a law student at that time. I signed in direct reliance on his instruction and representation.

8.    I subsequently learned that Blackburn had independent reasons to protect the narrative that Cassandra Ventura was a victim rather than a co-conspirator and trafficker. Specifically, Blackburn had retained numerous clients in connection with civil RICO complaints he intended to file against Sean Combs. Confirming Ventura's victim status served the government's prosecution of Combs and, by extension, the civil cases from which Blackburn stood to benefit professionally. Blackburn's financial and professional interest in the outcome of the Combs prosecution was in direct conflict with my interest in having my true account — which placed Ventura as my primary trafficker and co-conspirator — accurately told and publicly recorded.

9.    I further learned that Blackburn disclosed privileged and confidential information regarding my personal experiences to Defendant Alexandria Stapleton in violation of the attorney-client privilege. This disclosure of privileged communications to a party who was simultaneously involved in the documentary production constituted a fundamental breach of Blackburn's fiduciary and ethical duties to me as his client.

10.    Upon learning of these conflicts and violations, I formally terminated Blackburn's representation by written termination letter. A true and correct copy of that termination letter is submitted herewith as Exhibit D. The termination was for cause, based on Blackburn's conflicts of interest, his disclosure of privileged information, and his failure to advocate for my stated legal interests.

11.    Because Blackburn was acting against my interests at the time he advised me to execute the September 17, 2024 Appearance Release, and because he never explained the Release's terms or negotiated any protection for me, my signature on that Release was obtained under conditions of conflicted, inadequate, and adverse counsel. The Release is not enforceable against me for this reason among others.

PART III — THE FIRST INTERVIEW WITH DEFENDANT STAPLETON

12. My first interview in connection with the Documentary was conducted by Defendant Alexandria Stapleton via a Zoom video conference link that was created and controlled by Defendant Stapleton or her production team. At the outset of the call, Defendant Stapleton informed me that the meeting was being recorded. All representations I make herein regarding the substance of that interview are therefore verifiable upon discovery and production of the interview recording by Defendants.

13. The first interview lasted close to an hour, and possibly longer. During the interview, I was encouraged to discuss my connection to and involvement in the matters then under investigation by the Office of the United States Attorney. Defendant Stapleton's questions were directed primarily toward Sean Combs. Throughout the interview, I was steered away from discussing Cassandra Ventura's role in what I had experienced. I noticed this pattern during the interview itself and expressed my concern about it multiple times. I wanted to discuss Ventura's role because she was, in my direct experience, the primary actor in what was done to me. Each time I raised this concern, I was redirected.

14. Upon the conclusion of the first interview, Defendant Stapleton told me directly that she needed me in the Documentary. She stated that her desire was to produce the complete truth and that I was wanted because I represented the story that was being withheld from the public. She promised me that the truth would be told, that my story would not be suppressed, and that I had nothing to be concerned about. These representations were made directly to me by Defendant Stapleton and induced my continued participation in the production.

15. In the weeks following the first interview, I was deeply troubled. I knew that the account I had given — which focused on Combs at Stapleton's direction and largely excluded Ventura's role — represented only a partial truth. I began reaching out to Defendant Vanessa Sanchez to express my concerns. Defendant Sanchez did not respond to my first several outreach attempts. She finally responded in February 2025 — after I sent an email in which I detailed my concerns with specificity, including the statement: "No Puff, just Cassie — only ever Cassie." Sanchez responded on February 28, 2025, informing me that inaccuracy was not the objective. Based on that representation, a second interview was scheduled.

PART IV — THE IN-PERSON FIRST INTERVIEW: VENUE AND CIRCUMSTANCES

16.    My first in-person interview for the Documentary took place early one Sunday morning at a venue that had been operating as a nightclub the previous evening and had closed that same morning. I specifically recall arriving at the location in the early morning hours after the venue had closed from its prior night of operation. During this in-person interview, as with the Zoom interview, I was predominantly guided into responses concerning Sean Combs and directed away from discussing Cassandra Ventura. This pattern troubled me then, as it had during the Zoom interview. I expressed this concern during the interview. I was assured by Defendant Stapleton, Vanessa Sanchez, and by Blackburn that my interview was excellent and was exactly what was needed.

PART V — THE SECOND INTERVIEW: KEY ADMISSIONS BY DEFENDANT SANCHEZ
AND FULL DISCLOSURE BY PLAINTIFF

17.    In early March 2025, I traveled to Brooklyn, New York to participate in the second interview. Defendants arranged and paid for car service to transport me from my home at 24 Orchard Street, Carteret, New Jersey, to the filming location. The filming location was a rented townhouse. Upon my arrival, Defendant Sanchez led me upstairs to a bedroom of the townhouse before filming began.

18.    During this pre-interview private conversation with Defendant Sanchez, she made three critical admissions that I recall clearly and set forth herein. First, Sanchez informed me that none of the other participants in the Documentary had complied with the no-other-appearances clause in their agreements. Second, Sanchez told me that making public appearances would be fine and that it was acceptable for me to speak publicly. Third, Sanchez specifically thanked me for having honored my agreement and not making any prior appearances, explicitly distinguishing my conduct as uniquely compliant in contrast to all other participants.

19.    These admissions directly confirmed what I had suspected: that the Release was being applied selectively and exclusively against me while every other participant was permitted to speak freely. They further constituted an express authorization from

Defendants' own agent for me to make public appearances — an authorization I subsequently relied upon when I gave post-verdict interviews in July 2025.

20. The second interview itself was substantively different from the first. Defendant Stapleton did not direct my answers. I was permitted to speak freely and at length. During the second interview, I provided a comprehensive, detailed account covering eight years of my experiences: the sex trafficking by both Sean Combs and Cassandra Ventura; specific details regarding sexual assault, including an occasion on which Ventura drugged and sexually assaulted me; incidents of domestic violence; my observations regarding Combs' sexuality; and the full and complete role and conduct of Cassandra Ventura, including her active recruitment, coordination, and control of my participation in the trafficking enterprise over the course of nearly a decade.

21. The second interview was recorded by Defendants' production crew. Upon completion, Defendant Stapleton confirmed to me that the details I had provided were directly damaging to the existing public narrative regarding Ventura. Specifically, Defendant Stapleton stated that her production had uncovered information about Ventura that contradicted the public narrative that Ventura was solely a victim. This acknowledgment — made by the Documentary's director immediately after my interview — directly contradicts any claim that Defendants were unaware of the nature or significance of my testimony when they chose to suppress it.

PART VI — PUBLIC EXPOSURE, PLAINTIFF'S MEDIA APPEARANCES, AND DEFENDANTS' BELATED INVOCATION OF THE RELEASE

22. During the first days of the Combs criminal trial, my photograph and name were released to the media in connection with the government's case. Ventura herself testified under oath in a manner that directly implied I had been one of her more frequently used former escorts over a multi-year period. In the aftermath, attacks to my character and reputation followed immediately. Accusations emerged that I had been sexually assaulted by Combs and had engaged in homosexual activity with him. These accusations were factually false.

23. Following the conclusion of the Combs prosecution and the July 2, 2025 verdict, I chose to speak publicly. I provided four interviews, all of which conveyed the same core facts:

the truth of my experiences with Combs and Ventura, my status as a trafficking victim, and my objection to the false public characterization of my experience. In all of my interviews, I deliberately avoided referencing the Netflix Documentary or the production. I endeavored at all times to separate what I said publicly from anything that could be characterized as belonging to the production, recognizing that my personal account of my own experiences constitutes my own intellectual property.

24.    No mention of any violation of the Release's terms was made to me by any Defendant during or after my public appearances. The Release was not raised, invoked, or referenced in any communication from Defendants during this period. It was only after I contacted Defendants regarding my perception that I had been injured by the Documentary's misrepresentation of my account that Defendants attempted to invoke the Release to compel my silence and deter my attempt to seek legal remedies for Defendants' intentional misrepresentation of my trauma.

## PART VII — TERMINATION OF FORMER COUNSEL BLACKBURN AND ATTORNEY-CLIENT PRIVILEGE VIOLATIONS

25.    I formally terminated Tyrone Blackburn's representation upon learning that he had acted against my interests in order to protect and advance his separate goal of prosecuting Sean Combs through civil RICO complaints he intended to file on behalf of other clients. Among the specific bases for my termination was my discovery that Blackburn had revealed privileged and confidential information regarding my personal experiences to Defendant Alexandria Stapleton in connection with the documentary production. The disclosure of this information without my knowledge or consent, to a party who was a principal in the very production that would ultimately misrepresent my account, constituted a fundamental violation of the attorney-client privilege. I formally terminated Blackburn's representation in writing. A true and correct copy of that termination letter is attached hereto as Exhibit D.

26.    As a direct result of Blackburn's conflicted advice, I signed the Appearance Release without meaningful legal counsel, without adequate explanation of its terms, and without any negotiation of protective provisions. Had I received competent, unconflicted legal

advice, I would not have executed the Release in its present form, or at minimum would have negotiated material protective provisions governing accuracy obligations and my right to correct any misrepresentation of my account.

PART VIII — VERIFIABILITY OF REPRESENTATIONS MADE HEREIN

27. All representations I make in this Declaration regarding the content of my interviews with Defendants are verifiable upon discovery and production of the following materials, which are within Defendants' possession, custody, and control:

  a. The Zoom video and audio recording of my first interview with Defendant Stapleton;

  b. The video and audio recording of my in-person Sunday morning interview, including all unedited footage;

  c. The video and audio recording of my second interview in Brooklyn, New York in March 2025, including the unedited footage of the full four to six hours of testimony;

  d. All communications between Blackburn and any Defendant or member of the production team, including any disclosures of privileged information; and

  e. All editorial notes, production logs, and communications regarding the decision to exclude or limit the portions of my testimony addressing Cassandra Ventura's role.

28. Defendant Stapleton informed me at the outset of the Zoom interview that it was being recorded. All production interviews were conducted with professional recording equipment. To the extent any such recordings have been deleted or destroyed following the commencement of this litigation or the reasonable anticipation thereof, Plaintiff respectfully requests the Court consider appropriate spoliation remedies.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my personal knowledge, information, and belief. I understand that the making of a false statement in this Declaration subjects me to criminal penalties including imprisonment and fine.

Executed on: May 15, 2026

*Clayton Howard*

CLAYTON HOWARD

Plaintiff Pro Se

24 Orchard Street

Carteret, New Jersey 07008

(929) 781-7791

itsclaytonhoward@gmail.com